[S. F. No. 13947. In Bank.—July 30, 1931.]

FRANK W. LEIS, Appellant, v. CITY AND COUNTY OF SAN FRANCISCO et al., Respondents.

Joseph G. De Forest, Tobin & Tobin, Stoney, Rouleau, Stoney & Palmer, Charles H. Shurtleff, Hugh Henry Brown and Walter Shelton for Appellant.

John J. O'Toole, City Attorney, and Henry Heidelberg, Assistant City Attorney, for Respondents.

THE COURT.—This action was commenced by the plaintiff to obtain an injunction aimed to prevent the defendant City and County of San Francisco and its officials from carrying into effect the provisions of a certain resolution adopted by the board of supervisors of said municipality on December 12, 1927, and approved by the mayor thereof on December 23, 1927, directing the board of public works

thereof to proceed with the erection of a certain structure along and upon the southerly line of Fulton Street opposite and adjacent to the property of the plaintiff, and which would have the effect of preventing ingress into and egress from his said property into and upon Fulton Street. The contention of the plaintiff as set forth in his complaint is that Fulton Street throughout the entire width of 160 feet thereof lying between Leavenworth Street and the intersection thereof with Market Street is a public street, upon which his property, situate at and westerly for some distance from said intersection and along the southerly line of said Fulton Street, abuts, giving him the right of ingress thereto and egress therefrom, which said city by its aforesaid resolution is seeking to obstruct. The City and County of San Francisco by its answer to said complaint denies that the strip of land along and upon which defendant proposes by said resolution to direct the erection of said obstruction is a portion of the public street commonly known as Fulton Street, or that the same has ever been declared or dedicated as such by said municipality. Upon the trial of the cause upon the issue thus presented the evidence *pro* and *con* was practically undisputed, consisting chiefly in the introduction of and offer to introduce a considerable amount of documentary evidence, derived in the main from the official records of said municipality, and having particular reference to the establishment of the so-called civic center therein, and in the course thereof of the extension and opening of that broad avenue or esplanade looking westerly from Market Street to the park which forms the center of said so-called civic center and occupies the square immediately in front of the new city hall. ██ The evidence thus educed before the trial court being, as to the essential features thereof, undisputed and indisputable, the findings and conclusions of the trial court thereon amounted to merely conclusions of law, and as such the proper subject of review upon this appeal. The question as to what shall be required to constitute the dedication of a street by a municipality for public uses as such has not been made the subject of either code or other statutory definition in this state, although dedication is a method by which the public may acquire a highway as recognized in section 2618 of the Political Code, and although there are certain acts of the legislature providing a method

for the exchange of lands for street purposes, for the opening of new streets thereon, and for the abandonment and closing of property theretofore in use as public streets. (Stats. 1911, p. 1346.) The result of this absence of definite provisions from the statutory law of this state having relation to the subject of dedication of public streets is that the question as to whether such dedication of a specific area within a municipality has or has not been accomplished depends upon the application of the principles of the common law and upon the action of the courts in determining from the official charters, resolutions, ordinances, acts and conduct of said municipality whether the area claimed to have become and to constitute and be a public street has in point of fact and law been dedicated as such. (*Smith* v. *City of San Luis Obispo*, 95 Cal. 463 [30 Pac. 591]; *Wilcoxon* v. *City of San Luis Obispo*, 101 Cal. 508 [35 Pac. 988]; 9 Cal. Jur., p. 4; 18 C. J. 38, 41, 42; *People* v. *Marin County*, 103 Cal. 223 [26 L. R. A. 659, 37 Pac. 203]; 4 McQuillin, Municipal Corporations, p. 474; *People* v. *Beaudry*, 91 Cal. 213 [27 Pac. 610].)

The evidence in this case in so far as the trial court permitted its introduction purports to contain and exemplify the official purpose of the municipality to dedicate the entire 160 feet width of Fulton Street from its intersection with Larkin Street and abutment thereat upon the said civic center park eastwardly to the intersection of Fulton Street with Market Street as a public street. If the evidence thus educed establishes that purpose and if the evidence sought to be introduced on behalf of the plaintiff was and is germane to such purpose, it follows necessarily that the trial court was not only in error in the exclusion of such offered evidence, but was also in error in reaching the legal conclusion from the admitted evidence that the dedication of said area as a public street had not been accomplished. We shall, therefore, proceed to a review of such evidence and to a determination of the relevancy, effect and conclusiveness thereof in determining whether the trial court was in error in rendering and entering its judgment in favor of the defendant upon the evidence presented before it, and was also in error in refusing to permit the presentation of certain evidence offered in support of the plaintiff's contention.

Prior to the date and disastrous effect of the earthquake and fire of the year 1906 the City and County of San Francisco had no civic center, unless the space then occupied by the old city hall and bounded in part by Hyde and McAllister Streets and by what was then known as City Hall Avenue, which extended in a southwesterly direction from the southerly intersection of McAllister Street with Leavenworth Street to or adjacent to what was then known as Marshall Square, might be called such civic center. When the old city hall and its adjacent buildings were destroyed by such earthquake and fire and when the work of rehabilitation of the devastated city had been fairly entered upon, the public-spirited people of San Francisco, including its then officials and charter makers, began to formulate plans for the establishment of a civic center in the vicinity of where the old city hall had been and in the district bounded by Market and Franklin Streets and by Golden Gate Avenue. By the terms of the amendment to the charter of said municipality, adopted by its people in the year 1912 and approved by the legislature on March 28, 1913 (Stats. 1913, p. 1602), the board of supervisors thereof were authorized to acquire lands within the above-defined area for the purpose of establishing a civic center. In order to accomplish such purpose the board of supervisors was thereby given ample powers to acquire such lands and to make such exchanges of lands as might be required to carry out the very definite purposes provided for in the aforesaid amendment to the charter. Upon the adoption thereof the board of supervisors proceeded in various ways to carry into effect the purposes of such amendment. One of the earliest steps taken in that direction consisted in the official closing of certain portions of City Hall Avenue, which had theretofore extended transversely across the area to be thus acquired for and devoted to the declared purpose of a civic center, and in order to effectuate the closure of the portion of said avenue thus to be abandoned, and to effectuate such exchanges of the abandoned area with the owners of property theretofore abutting thereon as were made necessary by such closure, certain portions of what was formerly known as Marshall Square were also abandoned by similar processes and through the enactment of formal resolutions adopted by the board of supervisors and by certain exchanges of

such lands through the execution of mutual deeds, in conformity with the terms of said resolutions. It is to be noted, however, in this connection that the portion of City Hall Avenue which traversed the area now occupied by the open space lying between Hyde Street and the intersection with Market Street which, according to the plaintiff's contention has been dedicated as to the entire width thereof as a public street, was not at any time closed or abandoned as such by the board of supervisors in the course of acquiring such lands as had theretofore been owned by private persons in order to accomplish an opening of the esplanade which has come to be known as Fulton Street, and which has been designated as such in the numerous plats, maps and plans of the so-called civic center, which have from time to time been made either under the direct authority of the board of supervisors or under the implied authority and completed action of such subordinate bodies as the board of public works of said municipality in carrying forward to their present state of completion the charter plans for the formation and occupancy as a civic center of the foregoing area as defined by the terms of said charter. It is also to be noted as having an important bearing upon the decision of the trial court that the foregoing area designated and to be improved as a civic center, prior to the formulation of the plans for the acquisition and devotion thereof to such purpose, had been intersected by several long-established public thoroughfares, such as Hyde, Larkin, Grove, Hayes and Polk Streets and Van Ness Avenue. Fulton Street had formerly extended from Golden Gate Park eastwardly as far as Larkin Street. In the formulation of the plans for the civic center and in the course of the erection thereon of the new city hall and the establishment of the civic center park in its present location, it was necessary that the portion of Fulton Street lying within said area should be closed; but since the plans for the civic center as thus formulated embraced the opening of a broad esplanade extending from the point on Larkin Street where Fulton Street had formerly stopped eastwardly and parallel with McAllister Street and with Grove Street to Market Street, the area to be thus occupied thereby apparently took on the name of Fulton Street in the further plans and in the execution thereof on the part of the board of supervisors and the board of public

works pursuant to the creation of such esplanade. The foregoing fact, as above stated, has an important bearing upon the correctness of the conclusions and judgment of the trial court, since it is made to appear therefrom that a considerable portion of the so-called civic center area was either formerly occupied by the said public streets or was to be occupied by and devoted to such public street purposes in the consummation of the civic center plan. As to such public streets and thoroughfares, whether existent or in contemplation, and in the course of being acquired for use as such streets and thoroughfares, it may not be argued successfully that the control over such street areas was ever by the charter of said city, or otherwise, invested in the board of park commissioners of said municipality. ■ The charter itself in providing for the creation and powers of such board of park commissioners expressly limits the jurisdiction thereof to that of control over parks, squares, grounds surrounding public buildings and public pleasure grounds when acquired by said city and county, but gives them no jurisdiction or control over public streets. (See City Charter, art. XIV, sec. 1.) On the other hand, jurisdiction and control over each and all of the public streets, lanes and thoroughfares of said municipality, including the acquisition, opening, closing and improvement thereof, are by the terms of said charter entrusted exclusively to the board of supervisors and to its subordinate body, the board of public works. (See Charter, art. II, chap. 2.) ■ In so far, therefore, as the trial court undertook to hold that jurisdiction over the area occupied or to be occupied by the civic center of said municipality lay within the exclusive control of its board of park commissioners, including jurisdiction and control over such of the public streets thereof as lay within said area or as might be opened, improved, occupied and dedicated to public uses as such, the trial court was in error not only in its conclusions based upon such evidence as was admitted during the course of the trial bearing upon the opening and devotion to the uses of a public street of that portion of Fulton Street, so called, lying adjacent to and in the vicinity of plaintiff's said property, but was also in error in the exclusion of certain offered evidence on the plaintiff's behalf materially affecting the question of the dedication of the Fulton Street area to the uses of a public

thoroughfare and to the particular use of such area by the plaintiff herein for the purpose of ingress to and egress from his aforesaid property.

The particular acts and courses of official action and conduct on the part of the board of supervisors and its executive arm, the board of public works, upon which the plaintiff relies in proof of the dedication of the entire area of Fulton Street, so called, to such public uses, may be conveniently stated in narrative form as follows:

Following the adoption of the provisions of the charter having reference to the acquisition of a civic center above referred to, a period of public discussion ensued respecting its plan or form and the number and architecture of the public structures which were to occupy its area. A commission of well known architects was presently constituted to bring order out of this informal agitation and discussion and to report a civic center plan. After careful investigation this commission in the early part of the year 1912 made its report, accompanied with an elaborate plat or sketch showing the detailed plan of the area to be acquired for the purposes of a civic center, which report being adopted by the board of supervisors has since constituted the official plan and general design of said area. The plat or sketch accompanying this report purported to be a sort of bird's-eye view of the civic center as it was to be. It disclosed three essential features of the plan. These were, first, the location of the new city hall; second, the parked area in front of this proposed structure embraced within Polk, McAllister, Larkin and Grove Streets; third, a broad avenue or esplanade extending easterly from a point upon Larkin Street about midway between McAllister and Grove Streets, and parallel with these, intercepting Market Street at Leavenworth Street and intended to constitute the main entrance into the civic center proper and to furnish the vista of its chief architectural feature, the city hall. This avenue being projected along the more limited lines of what would have been originally Fulton Street, had the same extended beyond Larkin Street, was indicated upon said plat or sketch as an extension thereof, and was designated thereon by the name of "Fulton Street". There was in this sketch a good deal that was fanciful, such, for example, as the location of certain other public buildings and sug-

gested ornamentations which have not been followed in the later development of the area, but have remained substantially unchanged. Following the adoption of the architects' report the board of supervisors, on April 1, 1912, adopted a resolution directing the city attorney to institute a large number of condemnation suits against the owners of such private properties as were required to be taken in order to carry into effect the civic center plan. These suits were presently begun, but with one exception were never prosecuted to judgment for reasons which will presently appear. On March 13, 1913, the board of supervisors adopted a resolution having relation to the closing and abandonment of such portions of the former public street known as "City Hall avenue", which resolution by its terms provided for the extension of Fulton Street, from its former terminus at Larkin Street to Market Street at its junction with Leavenworth Street, and its descriptions as to the portions of City Hall Avenue to be abandoned contemplated only the closure of such portions thereof as would lie outside of the lines of the proposed extension of Fulton Street. In order to carry into execution the foregoing resolution a number of official plats or maps were prepared by the city engineer's office showing the properties to be condemned, the portions of City Hall Avenue to be abandoned, and also showing the portions thereof which would be embraced within the extension lines of said proposed extension of Fulton Street to Market Street. A number of these maps or plats were either presented or offered in evidence by plaintiff in his main case. In each and all of these the outline of the so-called Fulton Street is depicted, showing it to be of the width of 160 feet and of the extent above indicated. One of the most significant of these maps or plats was that prepared in November, 1913, in pursuance of a resolution of the board of supervisors and duly recorded as an official map of said municipality and upon which Fulton Street is delineated as of a width of 160 feet, extending from the parked area on Larkin Street to its intersection with the junction of Market and Leavenworth Streets. There were also prepared by the city engineer's office several particular plats intended to show those portions of the properties of private owners formerly abutting upon City Hall Avenue which were to be condemned, or,

in the event of an arrangement to that effect, exchanged for parts of such avenue which were to be abandoned in order that the portions of properties of said private owners which remained to them might have a frontage upon Fulton Street. These all show said street as of the width and extent above designated. At the inception of the trial of this cause the plaintiff produced a map or plat which purported to show with precise detail the situation eastwardly from Larkin Street to be effectuated by the condemnation proceedings and by the closure of City Hall Avenue with the properties of each private owner designated in the relation of each to said abandoned avenue and to the new or extended Fulton Street, which is delineated thereon as of the full width of 160 feet extending to Market Street. This map or plat was admitted in evidence without objection and was used throughout the trial as concededly a correct delineation of the matters set forth upon the face thereof. The condemnation suits and the proceedings for the closure of Fulton Street dragged their combined courses through several years, due to a very commendable effort on the part of the public officials and the private property owners to come together upon a basis of agreement which would avoid the necessity of a prolonged and compulsory legal procedure applicable to each individual case. ■ The result was a series of compromises between the municipality and the affected owners of these private properties, which finally took form in a succession of resolutions adopted by the board of supervisors authorizing the execution or acceptance of deeds on the part of each of these owners of such affected private holdings within the civic center area as were to be acquired for public structures or as were to abut upon "Fulton Street". In certain of these resolutions and of the deeds which passed pursuant to their direction the properties specifically designated in each as to come within public ownership were stated as being acquired for "Civic Center purposes". It is ingeniously argued by the respondents herein that these words convey the meaning that such properties were to be, in common with the parked areas af the civic center plan, under the exclusive control of the board of park commissioners and not of either the board of supervisors or the board of public works. There is, however, no merit in this contention since, as we have

already seen, those portions of the civic center area which constitute public streets are, by the terms of the charter provisions above referred to, under the control exclusively of the board of supervisors, acting through its executive arm, the board of public works. In several of these resolutions and conveyances, however, and, of greater significance, in certain of those directly transferring to the municipality property which would come within the projected lines of Fulton Street, the properties thus to be acquired are expressly stated as being so acquired "for street purposes". In the course of these negotiations, lasting through a series of years, the property rights of the municipality and of the owners of private property within the affected area were at length so far adjusted as to permit the opening of Fulton Street to the full width of 160 feet between Larkin and Hyde Streets; and accordingly we find the board of supervisors, by formal resolution adopted on October 17, 1919, declaring Fulton Street, between Larkin and Hyde Streets, "to the width of 160 feet to be a public street to be known as Fulton street". Following the official action thus taken, negotiations with those property owners whose holdings lay to the eastward of Hyde Street proceeded to the point of individual settlements of the same sort as those accomplished to the westward of Hyde Street, and in a number of these transactions, consummated by formal resolutions and the passage of deeds, the object to be obtained was declared to be that of the "opening of Fulton and Leavenworth streets into Market street". In the year 1925 these negotiations had been practically completed and Fulton Street was thrown open to public use and since that time down to the present it has been to all apparent intents and purposes and for all the usual uses thereof an open public street. In order to such uses the usual incidents of public streets, such as street lights, sewers, paving, sidewalks and street signs were installed. By the latter of these the new avenue at each intersection and at its point of junction with Market Street was designated as "Fulton Street". These various details were carried into effect by or under the direction of the board of public works without express direction from the board of supervisors, but with its apparent sanction, since the cost thereof in each instance was paid out of funds provided by said board. In the

year 1925 the city engineer caused to be prepared and filed what purports to be an official map of the area within and adjacent to the civic center, upon which Fulton Street to the full width and length thereof is depicted under that name as a public street. In that same year the board of supervisors by formal resolution or ordinance ordered "the improvement of intersection of Fulton street, Leavenworth street and Market street" and authorized and directed the board of public works to enter into a contract for such improvement. In conformity with such direction the board of public works by formal resolution entered into contracts with one Clarence B. Eaton for the making and completion of this proposed improvement, and the work having been completed in conformity therewith the cost of the same was ordered paid by the board of supervisors. At an even earlier date the board of public works had undertaken to lay a sidewalk along the southerly side of Fulton Street, between Hyde and Market Streets, adjacent to the property lines of the private owners whose properties, including that of the plaintiff herein, abutted upon that portion of the newly opened avenue; and while it does not appear that the board of supervisors by precedent formal action authorized the laying of said sidewalk it does appear that when the same was laid the cost thereof was paid out of public funds provided by said board.

In the year 1924 the plaintiff herein had purchased from the heirs or successors of the estate of Forbes the property described in his complaint herein as lying at the southerly junction of Market and Fulton Streets and extending for a distance of 116.297 feet along the southerly line of the latter street. Prior to his purchase of said property official permits had been granted by the board of supervisors to the former owners thereof for the erection of the buildings upon said property to abut, as to the rear thereof, upon Fulton Street, and such structures had, pursuant thereto, been erected having certain designated entrances and exits to and from Fulton Street. These were used by plaintiff for convenient access to and egress from his said buildings upon Fulton Street for the several years without objection up to the date of the adoption by the board of supervisors of the resolution of December, 1927, directing the board of public works to proceed with the erection of some sort

of structure along the southerly line of Fulton Street immediately adjacent to plaintiff's said property line and which if constructed would prevent his further use of Fulton Street as a means of ingress to and egress from his said property.

Upon the trial of the cause, however, it was conceded by counsel for the respondents that said resolution was a mere gesture intended to provoke the present action and that all that was really intended by the respondents was the assertion or preservation of a claim of right upon the part of the municipality to construct at some future time some form of ornamentation of the entrance into said avenue thus far designated as Fulton Street as would conform with certain suggestions made originally by the board of architects looking to the beautification of the entrance to said avenue. We are unable to find, however, from the evidence educed herein that this suggested ornamentation has ever assumed such definite form or substance as would constitute an actual interference with the rights of property ownerships at the junction of Market and Fulton Streets as would amount to a limitation upon the completed dedication of the area occupied by said avenue for the general uses of a public street. We do not hold, however, that in conformity with such uses the municipality may not provide for such ornamentation of this broad avenue, as for example by way of fountains, parked areas or even ornamental entrances as will tend to its beautification and to that of the civic center of which it forms a very essential feature without materially interfering with, but rather ministering to its uses as a broad and beautiful avenue or esplanade. The offending resolution of the board of supervisors which provoked the present action went obviously much further than any such innocuous intention, and amounted to a material interference with the rights of this plaintiff and other abutting property owners to the use of said avenue, provided it had become by dedication as to all of its width and length a public street. ■ We have no hesitation in holding from the evidence embraced in the record herein, only a portion of which we have herein undertaken to review, that the City and County of San Francisco by the official resolutions of its board of supervisors and by the consistent course of action and conduct on the part of its duly authorized officials,

acting in conformity and consistency therewith, has accomplished the dedication of Fulton Street eastwardly from Larkin to Market Street as a public street. ■ We are satisfied that the evidence which the trial court admitted without objection was sufficient to show such intended dedication and that the evidence which the trial court erroneously excluded was but cumulative in proof of the fact of such dedication. This being so, there is no necessity of returning this cause for the purpose of a new trial or for any other purpose than that of a direction to the trial court to make and enter its conclusions of law in conformity with the established and practically undisputed facts of this case; and having done so to make and enter its judgment in the plaintiff's favor in conformity with the views expressed in the foregoing opinion.

The present judgment, with such direction, is reversed.