[L. A. No. 18916.   In Bank.   July 5, 1944.]

CALIFORNIA EMPLOYMENT COMMISSION, Appellant,
v. E. D. BATES et al., Respondents.

Robert W. Kenny, Attorney General, Clarence A. Linn, Deputy Attorney General, and Forrest M. Hill and Doris H. Maier for Appellant.

William M. Crandall, E. M. Wachner and John C. Campbell for Respondents.

EDMONDS, J.—California Employment Commission, formerly Unemployment Reserves Commission, which administers the Unemployment Insurance Act (Stats. 1935, Chap. 352, p. 1226, as amended; Deering's Gen. Laws, 1935 Supp., Act 8780d, as amended), sued for contributions assertedly payable upon the amounts earned by the carriers of the Pasadena Independent from 1936 to 1940. The trial court found that E. D. Bates and F. F. Runyon, the owners and publishers of the newspaper, were not employers within the meaning of the statute and that the carriers were independent contractors. The commission has appealed from the judgment rendered against it on these findings and the question presented for decision is substantially the same as that determined in *California Employment Com.* v. *Los Angeles Down Town Shopping News Corp., ante,* p. 421 [150 P.2d 186].

The facts are undisputed. During the years for which contributions are claimed, respondents as copartners were en-

gaged in the publication and distribution of the Pasadena Independent. In 1936 the Independent was judicially determined to be a newspaper of general circulation under section 4460 of the Political Code; it has not been admitted by the United States Post Office as second class mail matter. The publication was delivered on Mondays, Wednesdays and Fridays of each week throughout the city of Pasadena and vicinity by carrier boys, practically all of whom were under the age of 18 years. The city or general distribution area was divided into approximately 200 routes. Although the price of the paper was 15 cents per month, in the absence of a stop order or notice to the contrary, the carrier left a paper at each residence on his route regardless of whether or not a subscription had been obtained.

Some of the boys were assigned to routes upon an application to carry the paper. Often an applicant had to wait until a route was open. Carriers were also secured through advertisements, and very often a boy was referred to the paper by one who was then working for it. When a boy was selected, the terms of a standard contract were explained to him. This contract, with a letter of transmittal, was mailed to the boy's parents for their signatures. Under the contract the carrier acquired no right or ownership in his route or subscription list and he could be discharged at any time the respondents desired to do so.

The letter stated that the paper would require the boy to make delivery to every family on the route which might be assigned to him and to call on each one of them at the end of the month. He was expected to get as many new customers as possible, and in connection with that purpose, to attend monthly meetings for sales training. The letter also stated that a work permit issued by the school authorities would have to be obtained. No contract was made without the signatures of the boy's parents, although, in some cases, work was commenced before the contract was signed.

At the time the boy was engaged he was given a map of the route assigned to him, instructed generally as to his compensation, expected earnings, manner and method of delivery, the importance of attending sales meetings, and the method to follow in securing subscriptions. Boys without experience in the delivery of papers were told how the papers should be folded, carried on their bicycles and delivered. At an

early hour of the morning of delivery days, the boys picked up the papers at street corners where they had been left by trucks. The carriers were not required to get the papers or to complete their delivery at any particular time but, of necessity, the routes had to be covered before school commenced. If a boy did not pick up his papers by 6 a. m., the district supervisor or inspector of the paper would call at the boy's home to ascertain the reason for his tardiness.

Practically all of the boys used bicycles, and although they were permitted to cover the route in any way they chose, the paper periodically issued bulletins or notices containing suggestions as to how a carrier might increase his efficiency and earning capacity. Six district supervisors or inspectors employed by the paper, each in charge of a particular number of routes, had charge of distribution. These men checked the boys' work, riding over each route. The paper required a report from the carrier upon each complaint concerning irregular delivery or improper conduct. If the publishers deemed the complaint was justified, a small fine was sometimes imposed upon the boy, but it was often remitted after explanation to the customer.

As compensation for his work, the carrier received one-half of his subscription collections with a guarantee of $5.00 per month. The collections were made in the last week of each month and the first week of the following month. Prior to each collection period, a meeting to which the respondents arranged transportation, was held at its offices. The carrier was then given the collection book for his route, and the circulation manager led a discussion concerning ways and means of improving delivery of the paper, increasing subscriptions and similar topics. The collection book consisted of a card for each resident on the route. The carrier was told to enter on the cards appropriate notations concerning the date of each call and whether a subscription was secured. As soon as a carrier had canvassed his route for subscriptions he prepared a collection summary sheet which, together with the collection book, was returned to the respondents' office for verification. If a carrier's book showed many calls and but few collections, another boy was sent to canvass the route. If a boy's collections were below average, the circulation manager discussed the situation with him. Occasionally such

a boy was asked to take a short vacation; sometimes he was discharged. The books of respondents reflected separate accounts for each carrier, showing his earnings and collections, and an honor chart was maintained upon which the boys were rated for collections, complaints, and general efficiency. Boys with superior ratings received passes to theatres, free trips, merchandise, and bicycle tires.

The appellant commission contends the evidence is insufficient to support the trial court's finding that the carriers were independent contractors and not employees within the meaning of the Unemployment Insurance Act. Arguing that the Legislature intended its definition of "employment" to be more inclusive than the scope of the employment relation as defined generally by the law of this state at the time the act was adopted, nevertheless, the commission maintains, according to settled principles which govern a determination as to when there is the relation of master and servant, the carriers were employees. The publishers deny that the Legislature by its definition of "employment," intended to broaden the scope of the employment relation and in support of the judgment maintain that, according to the law in effect at the time the legislation was adopted, the boys were independent contractors.

The facts relating to the conditions under which the carriers distributed the paper not only show that the publisher had the right to control the delivery methods of the boys, but an exercise of that control in detail. The carriers had no property right in their routes and they were subject to discharge for any violation of rules. In all essential respects their relationship with the publisher was the same as the carriers who were held to be employees in the Shopping News case, and the principles which were stated and applied as the grounds of that decision are determinative of the present controversy.

The judgment is reversed; the purported appeal from the order denying the motion for a new trial is dismissed.

Gibson, C. J., Carter, J., Traynor, J., and Schauer, J., concurred.

CURTIS, J.—I dissent for the reasons set forth in my dissenting opinion in *California Employment Commission* v. *Los*

*Angeles Down Town Shopping News, ante,* p. 427 [150 P. 2d 188].

Shenk, J., concurred.

Respondents' petition for a rehearing was denied August 4, 1944. Shenk, J., Curtis, J., and Schauer, J., voted for a rehearing.