[L. A. No. 19448. In Bank. May 2, 1947.]

H. N. ISENBERG, Respondent, v. CALIFORNIA EMPLOYMENT STABILIZATION COMMISSION et al., Appellants.

Robert W. Kenny, Attorney General, Clarence A. Linn and Doris H. Maier, Deputy Attorneys General, for Appellants.

John Moore Robinson for Respondent.

TRAYNOR, J.—Plaintiff brought this action pursuant to section 45.10 of the California Unemployment Insurance Act (Stats. 1935, p. 1226, as amended; 3 Deering's Gen. Laws, Act 8780d) to recover contributions paid under protest on the remuneration received by free-lance jockeys performing services for plaintiff during the period from April 1, 1944, to June 30, 1944. Defendant appeals from a judgment in favor of plaintiff.

During the period in question plaintiff owned a string of horses that he raced at Bay Meadows race track. He engaged free-lance jockeys to ride the horses in various races. They were not in his regular employment but were engaged separately for each race. In March, 1944, the California Employment Stabilization Commission ruled that the free-lance jockeys involved were in ''employment'' within the meaning of section 6.5 of the Unemployment Insurance Act and that any remuneration paid to the jockeys was subject to contributions as provided in the act.

The evidence at the trial related in the main to the customs and practices of the owners of race horses and the trainers generally in employing jockeys, and their control over the jockeys' activities in riding the horses. Plaintiff testified that he had no written agreement or understanding with the jockeys in question other than a standard form signed by the jockeys' agents specifying the jockey's name, the race, the date, and the first and second calls. There was no other evidence of any specific agreement, written or oral between the plaintiff and the jockeys whose services are involved in this case. Neither plaintiff nor defendant introduced any competent evidence as to the actual control exercised over the jockeys in question by the plaintiff and his trainer. The evidence showed that the jockeys, through agents, contracted with the owners to ride particular horses in particular races. In accordance with rule 278 of the rules adopted by the California Horse Racing Board pursuant to chapter 769, Statutes of 1933, the remuneration for the services of these jockeys was $35 when they won a race and $15 when they lost. Such remuneration was received by all jockeys in the absence of specific contract provisions to the contrary. It was shown that it is the custom for a jockey to report to the jockey room with his personal riding equipment at noon on the day of the race; that he changes into silks furnished by the owner and then proceeds to the paddock, where he meets with the owner or trainer. At this time either the owner or the trainer, acting as the owner's agent, gives instructions as to the running of the race and the handling of the horse; but, under rule 323(a) of the rules of the California Horse Racing Board, the owner or trainer can give no instructions or orders that do not have as their objective the winning of the race, unless the owner has more than one horse entered in the same race. If the owner or trainer does not wish the horse to be whipped, he may so instruct the jockey, but he cannot enforce such an instruction unless he has the whip taken from the horse upon application to the stewards, in which case no whip may be used on that particular horse until, upon the application of the owner or trainer, the stewards change the ruling. The owner must pay the jockey the contract price in the event he discharges the jockey without cause before the running of the race. Obviously, neither the owner nor the trainer can discharge the jockey while he is engaged in running the race. After the race, the owner or trainer usually confers with the jockey to ascertain how the horse performed and, if the horse

did not do as expected, the reasons therefor. If it is apparent that the jockey did not follow instructions, the owner does not engage the jockey to ride again.

There is no conflict in the evidence as to the facts outlined above, but plaintiff contends that defendant had the burden of showing the actual control exercised by plaintiff or his trainer over the jockeys in question, and since defendant failed to show that such control was actually exercised, the jockeys were properly held not to be employees. It is clear, however, that plaintiff made no showing that the owner or trainer did not exercise, or have the right to exercise, control except insofar as the right to exercise control was limited by the rules of the California Horse Racing Board or by the inaccessibility of the jockeys while actively engaged in the race. The only finding of fact made by the trial court on the question of employment was a general finding that during the period in question the free-lance jockeys engaged by plaintiff were not employees and the compensation paid them consisted of payments to independent contractors. The basis of this finding is clear from the memorandum opinion of the trial court. The trial court not only decided the case on the theory that the actual control exercised by the particular taxpayer over those performing services for him determines their relationship but placed the burden of proof on the defendant commission to show that control was actually exercised. It thus distinguished *Drillon* v. *Industrial Acc. Com.,* 17 Cal.2d 346, 351 [110 P.2d 64], upholding a determination by the Industrial Accident Commission that free-lance jockeys are employees within the meaning of section 3351 of the Labor Code. The facts in that case are substantially the same as those in the present case except that the right to control was shown by its actual exercise (*cf. Connell* v. *Harris,* 23 Cal.App. 537, 542 [138 P. 949] ; see 19 A.L.R. 226, 240) rather than by the customs and practices of the occupation. Clearly, the existence of a contractual right may be shown by usages and customs. (See *Hind* v. *Oriental Products Co., Inc.,* 195 Cal. 655, 667 [235 P. 438].)

The decision in the Drillon case was based on the right of the owner to exercise control over the jockeys (*supra,* at 355), the principal test of employment under section 6.5 of the Unemployment Insurance Act (*Empire Star Mines Co.* v. *California Emp. Com.,* 28 Cal.2d 33, 43 [168 P.2d 686]).

It was held that statutes and administrative regulations designed for public protection, such as the rules of the racing board, even though they may limit the principal's right of control, do not remove persons performing services for others from the protection of the Workmen's Compensation Act. In the present case the same reasoning is applicable to the same rules. (See *California Emp. Stab. Com.* v. *Morris,* 28 Cal.2d 812, 817 [172 P.2d 497].) Hence, the ultimate facts of this case are indistinguishable from those in *Drillon* v. *Industrial Acc. Com., supra.* Even if it is assumed that the actual exercise of control rather than the right to control is the crucial element in this case, it clearly is not the law that the burden of proof is on the taxing authority in an action by a taxpayer to recover taxes on the ground that they were illegally assessed. (See *United States* v. *Anderson,* 269 U.S. 422, 443 [46 S.Ct. 131, 70 L.Ed. 347] ; 3 Cooley, Law of Taxation, 4th ed. § 1307; and see *Robinson* v. *George,* 16 Cal.2d 238, 244 [105 P.2d 914], holding that the burden of proof generally is on the party attacking the employment relationship.)

It cannot seriously be contended that one who is an employee within the meaning of section 3351 of the Labor Code (Workmen's Compensation Act) is not engaged in ''employment'' within the meaning of section 6.5 of the California Unemployment Insurance Act. Section 3351 of the Labor Code provides that '' 'Employee' means every person in the service of an employer under any appointment or contract of hire or apprenticeship, express or implied, oral or written. . . .'' An employer is defined by section 3300 of the Labor Code to include ''Every person including any public service corporation, which has any natural person in service.'' Section 6.5 of the Unemployment Insurance Act defines employment as ''service . . . performed for wages or under any contract of hire, written or oral, express or implied.''

It has been held that the word ''employment'' as defined in section 6.5 of the Unemployment Insurance Act does not include independent contractors. (*Briggs* v. *California Emp. Com.,* 28 Cal.2d 50, 54 [168 P.2d 696].) In *Empire Star Mines Co.* v. *California Employment Commission,* 28 Cal.2d 33, 43 [168 P.2d 686], this court set forth the rules for the determination of the question whether or not a person is an independent contractor or is engaged in employment under·

section 6.5. The principal test of the employment relation-
ship was held to be the "right to control over the manner and
means of accomplishing the result desired." Strong evidence
of this right is shown by the right of the principal to dis-
charge the worker. The secondary tests are listed in that
opinion as including, "(a) whether or not the one performing
service is engaged in a distinct occupation or business; (b) the
kind of occupation, with reference to whether, in the locality,
the work is usually done under the direction of the principal
or by a specialist without supervision; (c) the skill required
in the particular occupation; (d) whether the principal or
workman supplies the instrumentalities, tools, and the place of
work for the persons doing the work; (e) the length of time
for which the services are to be performed; (f) the method of
payment, whether by time or by the job; (g) whether or not
the work is a part of the regular business of the principal;
(h) whether or not the parties believe they are creating the
relationship of employer-employee. (Rest., Agency, § 220;
Cal.Ann. § 220.)"

It has already been observed with regard to the principal
test, that the owner or trainer has the right of control except
insofar as he is limited by the rules of the racing board. The
right to discharge in this case is limited only by the rule
that the owner may not discharge a jockey without cause
unless he pays the contract price. There is no question that
the owner may discharge a jockey up to the time he is out on
the track and physically out of his control. As in any contract
of employment for a fixed period, an employee prematurely
discharged without cause may recover damages based on his
wages. (*W. F. Boardman Co.* v. *Petch,* 186 Cal. 476, 483
[199 P. 1047] ; *cf. Drillon* v. *Industrial Acc. Com., supra,* at
354.)

Among the secondary elements of the employment relation,
only three are clearly absent from this case: (c) Jockeys are
not unskilled workmen; however, many skilled workmen are
employees. (e) Free-lance jockeys are employed for a fixed
period, the duration of one race. (f) The basis of payment
is the race, not the time involved. The other elements are
either present or inapplicable to this case: (a) The occupa-
tion is an integral part of the owner's business. (b) The
work is usually performed under the direction of the owner or
trainer to the extent allowed by the rules of the California
Horse Racing Board. (d) Although the jockey furnishes his

personal riding equipment the silks and the horse are furnished by the owner. (g) The question whether horse racing is the regular business or occupation of owners of race horses is immaterial in determining whether jockeys are employees. The plaintiff made no showing that it was not his regular occupation and testified that he could not say what his regular occupation was. (h) The belief of the parties as to the relationship created is relevant only to indicate whether or not there was an assumption of control by the principal and submission thereto by the worker. (Rest., Agency, § 220, comment (i).) ■ There was no evidence in regard to the belief of the parties as to their relationship at the time the services were performed. The belief of the jockeys, however, that they would not be rehired if they failed to follow instructions is relevant to show their submission to control.

■ Plaintiff contends that the judgment cannot be reversed, since it is based on a conclusion drawn from the evidence as an inference of fact, not as a conclusion of law. There was no evidence from which the trial court could reasonably have drawn any inference inconsistent with the conclusion that the plaintiff had the right to control the activities of the jockeys except where he was prevented from doing so by the rules of the Racing Board or by the inaccessibility of the jockeys while they were actively engaged in the race. The contention that the question whether a person is an employee under section 6.5 of the Unemployment Insurance Act is wholly one of fact, even when the evidence is not in conflict and not reasonably susceptible of conflicting inferences, is untenable. Under such a rule there would be nothing to prevent conflicting interpretations of identical facts by the various trial courts so that free-lance jockeys would sometimes be classified as employees and sometimes not. Such a rule would make effective enforcement of the Unemployment Insurance Act impossible.

In *California Emp. Stab. Com.* v. *Morris,* 28 Cal.2d 812, 818 [172 P.2d 497], this court, applying the same rule as that applied in the Drillon case, *supra,* held that the Real Estate Act insofar as it regulates real estate salesmen for the protection of the public is not relevant to the question whether such salesmen are employees under section 6.5 of the California Unemployment Insurance Act. The court stated that ''. . . the occupation of real estate salesmen, insofar as the Unemployment Insurance Act is concerned, is one that may be classified

as that of an employee, or an independent contractor, depending upon the facts of the particular case." Clearly this statement does not mean that the trial courts of the state can conclude that, under section 6.5, one real estate salesman is an employee while another operating under identical facts is not. It means that whether a particular type of real estate salesman is within the purview of the act depends on the facts involved in the relationship between such salesmen and their principals rather than on some statute that has no relation to unemployment insurance.

The result of the application of the rules of law set forth in *Empire Star Mines Co.* v. *California Emp. Com., supra,* will depend in any particular case on the essential facts of that case. Thus, in *California Emp. Com.* v. *Bates,* 24 Cal.2d 432, 436 [150 P.2d 192], the judgment of the trial court was reversed because the conclusion of the trial court from the facts was inconsistent with the decision in *California Emp. Com.* v. *Los Angeles Down Town Shopping News Corp.,* 24 Cal.2d 421, 425 [150 P.2d 186], where the facts were substantially the same. This holding is in accord with the rule, particularly applicable to public law cases where uniformity of decision is important, that if the essential facts are not in conflict the question of the legal relations arising therefrom is a question of law. (*Leis* v. *City and County of San Francisco,* 213 Cal. 256, 258 [2 P.2d 26] ; *San Diego Trust & Savings Bank* v. *San Diego County,* 16 Cal.2d 142, 153 [105 P.2d 94, 133 A.L.R. 416].)

The judgment is reversed.

Gibson, C. J., Shenk, J., Carter, J., and Spence, J., concurred.

EDMONDS, J.—In my opinion, the decision in this case departs from the established rule that the judgment of the trial court will not be disturbed if there is substantial evidence to support its determination. Giving full effect to the evidence and the reasonable inferences to be drawn from it, the finding that an independent contractor relationship existed between the owner and the jockeys should be upheld. As stated by the trial judge in his memorandum of opinion, "there is sufficient evidence in the record to establish the fact that the jockeys in question were independent contractors although the evidence is in dispute."

I agree that the burden of establishing an independent contractor relationship is upon the party attacking the determination of employment (see *Industrial Ind. Exch.* v. *Industrial Acc. Com.*, 26 Cal.2d 130, 136 [156 P.2d 926]). Quite evidently that rule was followed in the trial of this case, and, in any event, this court may not rely upon an error of law found in a memorandum of opinion as a basis for reversal. (*DeCou* v. *Howell*, 190 Cal. 741 [214 P. 444]; see Witkin, New Rules on Appeal, 17 So.Cal.L.Rev. 109.)

A jockey, called as a witness in behalf of Isenberg, testified, "I think the procedure is, that if an owner is willing to pay a rider his fee, that he can substitute a rider." This was in answer to the question as to whether it was "possible for . . . [the jockey] . . . to be removed from that mount without the horse being taken out of the race?" As indicated by other testimony of this witness, he was not necessarily referring to the rules of the Racing Board, and it reasonably may be inferred that in his statement as to "the procedure" he was referring to the agreement of the parties or the national custom.

There was also evidence from which it reasonably could be inferred that the jockeys were not required to follow instructions given them. One jockey testified that "His trainer sometimes gave . . . [him] . . . instructions how he thought a horse would run best." But, he added: "They [owner and trainer] have suggested ways of riding them [horses]. I wouldn't say they told me just how to ride them. That is impossible." As to whether or not such instructions were followed, he testified, "Well, if I found out that the horse wasn't running under those instructions, I would try some other means of getting him to run." This witness also testified that the owner "may leave it up to your own judgment" as to manner in which the jockey should ride. When asked whether he used his own judgment when riding in a race, he replied: "Yes, you have to use your own judgment. Instructions are followed only when you don't figure in your own judgment that they hinder the chances of winning."

It is the well settled rule that when there is a conflict in the evidence, including not only objective facts but also the inferences which reasonably may be deduced therefrom, the determination of the trial court, in regard to the legal relationship of the parties to a controversy, will not be disturbed. (*California Emp. Stab. Com.* v. *Norins Realty Co.*, 29 Cal.2d 419 [175 P.2d 217]; *California Emp. Stab. Com.* v.

*Morris,* 28 Cal.2d 812 [172 P.2d 497]; *Twentieth etc. Lites* v. *California Dept. Emp.,* 28 Cal.2d 56 [168 P.2d 699]; *Briggs* v. *California Emp. Com.,* 28 Cal.2d 50 [168 P.2d 696]; *Empire Star Mines Co.* v. *California Emp. Com.,* 28 Cal.2d 33 [168 P.2d 686].) And although strong evidence in support of an employment relationship is the right to discharge at will, without cause, the fact that a person's services may not be so terminated justifies the finding of an independent contractor relationship (*Briggs* v. *California Emp. Com., supra,* p. 54; *Empire Star Mines Co.* v. *California Emp. Com., supra,* p. 45).

The testimony quoted clearly warrants a conclusion of lack of control, and there is other evidence which supports the trial court's determination. The jockey furnished most of his own equipment. The method of payment was by the race, not according to the time involved. Jockeys are skilled workers and are employed for a fixed period, the duration of the race. Giving no effect to the rules of the Racing Board, the trial court had ample ground for deciding that an independent contractor relationship existed between the owner and the jockeys. Evidence that, by custom, the owner or trainer had the right to give instructions to the jockey, merely raised a conflict in the evidence which was resolved by the trier of fact. Furthermore, the rules of the Racing Board limit the right of the owner and trainer to control the activities of the jockeys and, therefore, support the finding of an independent contractor relationship.

Neither *California Emp. Stab. Com.* v. *Morris, supra,* nor *Drillon* v. *Industrial Acc. Com.,* 17 Cal.2d 346 [110 P.2d 64], is inconsistent with this conclusion. In the Morris case, the trial court found that certain real estate salesmen were independent contractors. Upon appeal from the judgment, the commission contended that the Real Estate Act gave a broker the right to control a salesman in certain ways and, therefore, as a matter of law, and regardless of a trial court's finding, all real estate salesmen were employees. Rejecting this contention, the court held that there was evidence to support the finding of the lack of control, and the provisions of the Real Estate Act did not compel a contrary determination. In the Drillon case, the Industrial Accident Commission decided that certain jockeys were employees. As requiring a reversal of the judgment, the taxpayer relied upon the rules of the Racing Board which restrict the right of an owner and trainer to control the activities of a jockey. These rules, it

was urged, establish, as a matter of law, that a jockey is an independent contractor. But the court refused to so construe them, and held that the evidence supported the trial court's determination.

These cases are clearly distinguishable from the situation presented in the record now under review. Here the trier of fact determined that the jockeys who rode Isenberg's horses were independent contractors. The commission attacks the decision upon the ground that the only evidence in the record which supports the trial court's finding of lack of control is the limitations found in the rules of the Racing Board. The issue in this regard, therefore, is whether the rules may be used to support a finding of the trial court. In the Morris and Drillon cases, the question was whether, when there is evidence to support the finding of the trial court or commission, may the rules of the Racing Board or the regulatory provisions of the Real Estate Act be invoked to compel a determination contrary to those findings. Both the Morris and the Drillon cases hold that the effect of such rules or regulations is, at most, to set up a conflict in the evidence; they may not be used to require findings contrary to those made by the trial court upon substantial evidence.

Also, I do not agree with the strong implication in the majority opinion that the determination of the legal relationship is primarily a question of law. This implication is found in the reference to the Workmen's Compensation Act, the holding, in effect, that the Drillon case controls the disposition of the present controversy, and the direction that judgment be entered in favor of the commission. Moreover, the cases of *California Emp. Com.* v. *Los Angeles Down Town Shopping News Corp.*, 24 Cal.2d 421 [150 P.2d 186], and *California Emp. Com.* v. *Bates,* 24 Cal.2d 432 [150 P.2d 192], are cited as standing for the proposition that whether persons are independent contractors or employees is, in effect, a question of law. On the contrary, in the first of these cases the decision was based upon the proposition that ''there is substantial evidence to support the findings of the trial court that the boys were employees within the meaning of the Unemployment Insurance Act. . . .'' The ground of decision in the Bates case was that there was no substantial evidence to support the trial court's finding of an independent contractor relationship. This is quite different from the present statement that the judgment in favor of Bates ''was reversed because the conclusion of the trial court from the facts was

inconsistent with the decision in *California Employment Commission* v. *L. A. Shopping News Corporation,* 24 Cal.2d 421, 425 [150 P.2d 186], where the facts were substantially the same.''

For these reasons, I would affirm the judgment of the trial court.

SCHAUER, J., Dissenting.—I agree with the views expressed by Mr. Justice Edmonds. I am thoroughly cognizant of the (at least to the involved agencies) administrative desirability of having a simple, absolute, and universal or rule of thumb method for classifying entire industrial or professional groups as employes or nonemployes. But that desirability certainly does not warrant this court in departing from constitutional standards. Is it the intention of the majority of this court to hold that as a matter of law all jockeys who ride horses for compensation, regardless of the more specific terms of their several contracts, are employes? If that is *not* the effect of the holding its avowed object is not attained. If that *is* the effect of the holding it means that stable owners and riders no longer are permitted the freedom of mutually contracting such reciprocal relationships as they may agree upon. No longer do they have the right or capacity to establish the character of their obligations to each other. No matter how specific may be the terms by which they agree that the rider is a skilled specialist, that he shall furnish his own equipment, that he shall undertake a single project to be performed in his own way without any supervision or direction of the owner, the result will be the same as though the converse of all those heretofore material elements were substituted.

It is difficult for me to believe that the majority actually subscribe to the doctrine above indicated. But if they do not subscribe to it then not only do they fail to achieve the assertedly desirable objective of administrative universality but the only other rational basis for their holding in this case is equally disturbing. It means not that there shall be uniformity in classifying all jockeys as employes but that the majority have weighed the evidence in this one case and have themselves elected to draw inferences contrary to those drawn by the trial court. The evidence related by Mr. Justice Edmonds is in the record. It admits of the inferences suggested by him. Those inferences support the trial court's judgment. The functions of trial and appellate courts are

constitutionally disparate and no rule should be more scrupulously observed by courts of appeal than that in their appellate work they should not encroach upon or usurp a trial court function. The resolution of factual questions including the determination of the inferences to be drawn from the evidence whether that evidence be documentary or undisputed or otherwise, is in a major sense exclusively the province of the trial court (or of the jury). It is exclusive in the trial court (or jury) in the sense that the appellate court is given no right to resolve factual conflicts or to indulge its preference as to the selection of inferences from the evidence. It is only where clearly there is no substantial evidence from which essential inferences can be drawn that the appellate court may properly interfere in a factual sense; and its interference then should be both in form and in substance by a statement of the law, not a declaration of fact. Any other course by an appellate court is dictatorial in nature and tends toward depriving litigants of the constitutional standards of a fair trial.

The principles involved in this case are markedly similar to those in *Cardillo* v. *Liberty Mutual Ins. Co.* (1947), —— U.S. —— [67 S.Ct. 801, 91 L.Ed. ——]. There the critical question was whether the injury was one "arising out of and in the course of employment." In a proceeding before the commissioner under the District of Columbia Workmen's Compensation Act it had been found that the injury which resulted in the decedent's death had so arisen and an award was made to the widow. The employer and insurance carrier brought action in the district court to annul the award; they contended that there was "a lack of substantial evidence" to support the essential finding. The district court held that the findings "were supported by evidence in the record" but the Court of Appeals reversed. The Supreme Court in reversing the Court of Appeals and reinstating the judgment of the district court said: (pp. 806-807 of 67 S.Ct.) "In determining whether a particular injury arose out of and in the course of employment, the Deputy Commissioner must necessarily draw an inference from what he has found to be the basic facts. . . . If supported by evidence and not inconsistent with the law, the Deputy Commissioner's inference that an injury did or did not arise out of and in the course of employment is conclusive. No reviewing court can then set aside that inference because the opposite one is thought to be more reasonable; nor can the opposite inference be substituted by the court because

of a belief that the one chosen by the Deputy Commissioner is factually questionable. *Voehl* v. *Indemnity Ins. Co., supra* [288 U.S.] 166 [53 S.Ct. 380, 77 L.Ed. 678, 87 A.L.R. 245]; *Del Vecchio* v. *Bowers,* 296 U.S. 280, 287 [56 S.Ct. 190, 80 L.Ed. 229]; *South Chicago Co.* v. *Bassett,* 309 U.S. 251, 257-258 [60 S.Ct. 544, 84 L.Ed. 732]; *Parker* v. *Motor Boat Sales,* 314 U.S. 244, 246 [62 S.Ct. 221, 86 L.Ed. 184]; *Davis* v. *Department of Labor, supra* [317 U.S.] 256 [63 S.Ct. 225, 87 L.Ed. 250].

*"It matters not that the basic facts from which the Deputy Commissioner draws this inference are undisputed rather than* controverted. See *Boehm* v. *Commissioner,* 326 U.S. 287, 293 [66 S.Ct. 120, 90 L.Ed. 78, 166 A.L.R. 708]. It is likewise immaterial that the facts permit the drawing of diverse inferences. The Deputy Commissioner alone is charged with the duty of initially selecting the inference which seems most reasonable and his choice, if otherwise sustainable, may not be disturbed by a reviewing court. *Del Vecchio* v. *Bowers, supra* [296 U.S.] 287 [56 S.Ct. 190, 80 L.Ed. 233]. *Moreover, the fact that the inference of the type here made by the Deputy Commissioner involves an application of a broad statutory term or phrase to a specific set of facts gives rise to no greater scope of judicial review. Labor Board* v. *Hearst Publications,* 322 U.S. 111, 131 [64 S.Ct. 851, 88 L.Ed. 1170]; *Commissioner* v. *Scottish American Co.,* 323 U.S. 119, 124 [65 S.Ct. 169, 89 L.Ed. 113]; *Unemployment Compensation Commission* v. *Aragan,* 329 U.S. 143 [67 S.Ct. 245, 91 L.Ed. ——]. *Even if such an inference be considered more legal than factual in nature, the reviewing court's function is exhausted when it becomes evident that the Deputy Commissioner's choice has substantial roots in the evidence and is not forbidden by the law."* (Italics added.)

Again, in an action which originated in a state court under the Federal Employers Liability Act (35 Stats. 65, as amended, 45 U.S.C. § 51 et seq.) and which was before the United States Supreme Court on certiorari after the state Supreme Court had reversed a trial court "for insufficiency of evidence to show negligence," the highest court said (*Ellis* v. *Union Pacific Railroad Co.* (1947), 329 U.S. 649 [67 S.Ct. 598, 600, 91 L.Ed. ——]) "The choice of conflicting versions of the way the accident happened, the decision as to which witness was telling the truth, *the inferences to be drawn from uncontroverted as well as controverted facts, are questions for the*

*jury. Tennant* v. *Peoria & P. U. R. Co.,* 321 U.S. 29 [64 S.Ct. 409, 88 L.Ed. 520] ; *Lavender* v. *Kurn, supra* [327 U.S. 645 (66 S.Ct. 740, 90 L.Ed. 916).] Once there is a reasonable basis in the record for concluding that there was negligence which caused the injury, it is irrelevant that fairminded men might reach a different conclusion. For then it would be an invasion of the jury's function for an appellate court to draw contrary inferences or to conclude that a different conclusion would be more reasonable.'' (Italics added.) To the same effect is *Eagles* v. *United States ex rel. Samuels* (1946), 329 U.S. 304 [67 S.Ct. 313, 91 L.Ed. ——] (the case of a selective service registrant seeking to evade service as a theological student), where the court, in recognizing the force of that class of practical evidence which so often appears to the fact finder but which cannot be reflected in a phonographic record, said: ''A registrant might seek a theological school as a refuge for the duration of the war. Congress did not create the exemption . . . for him. There was some evidence that this was Samuels' plan; and that evidence, *coupled with his demeanor and attitude,* might have seemed more persuasive to the boards than it does in the cold record. Our inquiry is ended when we are unable to say that the board flouted the command of Congress in denying Samuels the exemption.'' (Italics added.) See, also, *Estate of Bristol* (1943), 23 Cal.2d 221, 223 [143 P.2d 689].

For the reasons above set forth I would affirm the judgment of the trial court.