[Civ. No. 15514. Third Dist., Sept. 23, 1976.]

CASPER W. SMITH et al., Plaintiffs and Respondents, v.
DEPARTMENT OF EMPLOYMENT et al.,
Defendants and Appellants.

## COUNSEL

Evelle J. Younger, Attorney General, Ernest P. Goodman, Assistant Attorney General, Edward P. Hollingshead and Charles Kobayashi, Deputy Attorneys General, for Defendants and Appellants.

Haight & Harriman, Gerald A. W. Haight and Richard L. Harriman for Plaintiffs and Respondents.

## OPINION

**REGAN, J.**—In this appeal by the defendants (hereafter "Department") from a money judgment in favor of plaintiffs, the Department contends that the amounts collected by it as contributions based on an employer-employee relationship were lawfully collected. The sole issue is whether certain telephone solicitors were independent contractors or employees. The trial court, having made its findings of fact, concluded that the solicitors were not employees, but independent contractors, and thus the tax assessments of the Department were not properly made.

The parties stipulated at trial that the case should be decided by the court, without a jury, entirely upon the administrative record in the earlier proceedings wherein the Unemployment Insurance Appeals Board had denied plaintiffs a refund of the assessment levied by the Department. It was further stipulated that the court should proceed in the matter as a trial de novo, not as a judicial review of the administrative record. The court therefore proceeded to examine the record and to consider trial briefs of the parties, after which it made its ruling. The court found the following facts:

"1. During the period January 1, 1964 through June 30, 1966 the plaintiff was engaged in the promotion and sale of tickets for baseball and football teams. The plaintiff utilized the services of telephone solicitors in the promotion and sales work.

"2. The telephone solicitors work generally stated [*sic*] in San Diego early each year.

"3. The telephone solicitors would operate from the hotel room, which was equipped with numerous desks and telephones. Plaintiff secured the hotel room and telephones in each town; however, the solicitors would pay for the room, supplies, telephones.

"4. To obtain solicitors, the plaintiff would advertise in the San Francisco Chronicle which was the newspaper customarily used by the solicitors in hunting for a job.

"5. There generally were no regular working hours.

"6. Telephone solicitors were paid on a commission which was based on the number of sales made and paid for.

"7. No bonuses were offered by plaintiff to the solicitors.

"8. The amount of the commission ranged from 20% to 25% of the gross sales.

"9. There was no bargaining as to what amount would be paid to the solicitors.

"10. The solicitors were transient workers with hardly any one person ever lasting the entire work season, which benerally [*sic*] began in San Diego and then moved from town to town.

"11. The solicitors could, at any time request payment of the money they had earned. In fact, it was not uncommon for them to request payment after just one day's work.

"12. There was a high turnover of the solicitors.

"13. Usually plaintiff tried to have eight to ten persons working at a time, but because of the high turnover rate, plaintiff generally engaged 65 to 70 persons during its stay in San Diego, which averaged about six weeks annually.

"14. The work in any one location lasted for only a brief period; however, generally the same people tended to be rehired year after year.

"15. There never was any agreement as to the length of time that any solicitor would stay with plaintiff.

"16. Each room from which plaintiff operated had a room manager who was an employee of the plaintiff.

"17. The work of the telephone solicitors was a separate and distinct aspect of plaintiff's business.

"18. The solicitors prior to employment entered into a contract of employment wherein the solicitors were designated as having an independent contractor relationship with plaintiff.

"19. The plaintiff instructed the solicitors as to the basic approach that they should use; and the plaintiff further instructed the solicitors that they were to tell the prospective buyers that they were representatives of a local baseball or football club."

Of all the above facts, as found by the trial court, the only one attacked by the Department as being unsupported by substantial evidence is Finding No. 17. However, the Department asserts there were other facts, which although not found by the trial court, were vital to the proper decision of this case and based upon which a different decision should have been reached. These facts, as asserted by the Department, were that (a) the plaintiffs had the right to control "certain activities of the solicitors," particularly as to "how" the solicitors were making their telephone calls; and (b) in cases of overpayment to a solicitor, the loss was absorbed by plaintiffs. Plaintiffs take the position that the evidence showed no such control over the telephone solicitors. Other than in the respects just referred to, the parties are in essential agreement that the facts as found by the trial court are the facts of the case.

█ The Department's most significant contention is that applying the common law test for determining employee or independent contractor status (*Empire Star Mines Co.* v. *Cal. Emp. Com.* (1946) 28 Cal.2d 33, 43-44 [168 P.2d 686]; *Sudduth* v. *California Emp. Stab. Com.* (1955) 130 Cal.App.2d 304, 310-312 [278 P.2d 946]), the trial court erred in determining that the solicitors in this case were independent contractors.

█ The *Empire Star Mines* case, *supra*, requires that the following circumstances be taken into consideration in deciding an issue of

employee versus independent contractor: "(a) whether or not the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee." (See, 28 Cal.2d at pp. 43-44.)

We shall apply the above factors or tests to the facts of the instant case.

(a) *Distinct Occupation.*

Neither the express findings of the trial court nor the record as a whole support a conclusion or determination that the telephone solicitors doing the work involved in this case were engaged in a "distinct occupation or business" as that term was used by the Supreme Court in the *Empire Star Mines* case, *supra.* No special training or experience was required. No education requisites existed. A person selling tickets by telephone may not be considered under the norms and mores of our society in the same vein as a skilled artisan, tradesman or businessman. (See Rest.2d Agency, § 220, (2)(b), and com. on (2).)

(b) *Custom in the Locality.*

There is no evidence in the record that in the localities in which the Smith Company operated there was any custom that decreed or indicated that telephone solicitation of ticket sales to sporting events was usually done under the direction of a principal or by a specialist without any supervision.

(c) *Skill.*

As pointed out under (a) above, little or no education, training or experience was required to do the work. The type of persons working at it for the Smith Company were described by Smith as transients who come and go and who for the most part had severe drinking problems,

and many had to be dismissed for working while under the influence of alcohol.

(d) *Tools and Place to Work.*

The solicitors did not furnish their own tools and place to work. Even though, as found by the trial court, they paid for the room, supplies and telephones (finding No. 3, *ante*), the plaintiff company obtained the rooms, telephones and supplies. Furthermore, the *method* of payment for tools and work place was significant. Two percent was deducted from gross commissions, but only when a sale was made, so that when a call was made and no sale was consummated the solicitor paid nothing for the phone or office expense.

(e) and (f) *Length of Work Time and Method of Payment.*

The solicitors very seldom worked for more than a very short period of time. The contract which each signed did not specify any length of time and many only worked for one day. Some stayed several weeks or months, however. Compensation was by commission. No salary or expenses were paid.

(g) *Regular Business of the Principal (Smith Company).*

It was the regular business of the Smith Company, and had been for many years, to undertake telephone ticket sales campaigns for various athletic teams and events in various localities. Casper Smith himself, and his wife also, frequently acted as room managers.

(h) *Belief of Parties.*

The only testimony as to the belief of the parties relating to what type of legal relationship they were entering into was the testimony of Casper Smith to the effect that he intended and believed the written contract signed by the solicitors which designated them throughout as "independent contractors" was controlling. He also testified that with respect to the solicitors he personally saw them reading the document from time to time and he did not feel anyone could read it and sign it without realizing he was an independent contractor. ▪ Aside from the fact that portions of Mr. Smith's testimony are obviously hearsay or inadmissible opinion evidence as to the belief of the solicitors, the fact that Smith and the solicitors signed such contracts is not of itself determinative of the actual relationship established. (See Rest.2d

Agency, § 220, com. m.) Neither is the belief of the parties determinative when there is admissible evidence of the belief of *both,* except insofar as such belief may help to determine the basic issue of complete control by one party and submission to control by the other. (*Ibid.*) In the instant case there was no testimony by any solicitors, so we have no direct evidence of their belief as to the relationship. In view of the state of the record, we can draw no conclusion of any controlling weight from the testimony of Casper Smith as to "belief." (Cf. *Isenberg* v. *California Emp. Stab. Com.* (1947) 30 Cal.2d 34, 40 [180 P.2d 11]; *Smith* v. *Belshaw* (1891) 89 Cal. 427, 430 [26 P. 834]; *Pryor* v. *Industrial Acc. Com.* (1921) 186 Cal. 169, 172 [198 P. 1045]; *Malloy* v. *Fong* (1951) 37 Cal.2d 356, 372 [232 P.2d 241].)

To all the foregoing, we must apply the rule of law established in this type of case that the burden is upon the party seeking to recover an unemployment tax assessment to prove that it was illegally assessed. (*Sudduth* v. *California Emp. Stab. Com., supra,* 130 Cal.App.2d at p. 311.) We are of the opinion that neither the facts as found by the trial court nor the evidence in the record as a whole can be held to satisfy this burden of the plaintiff; they do not establish that the solicitors were working independently and free from the authority of the Smith Company, if it wished to exercise it, to control the manner and means by which they accomplished the desired result. We also conclude that there was a right in the Smith Company to discharge a solicitor at will without cause and free of legal liability for so doing. (*Empire Star Mines Co.* v. *Cal. Emp. Com., supra,* 28 Cal.2d at pp. 43-44; *Sudduth* v. *California Emp. Stab. Com., supra,* 130 Cal.App.2d at pp. 311-312.) Having so concluded, we must reverse the judgment of the trial court, which was based on its erroneous legal conclusion that the solicitors were proven to be independent contractors.

In view of our conclusion above set forth, it is unnecessary to discuss other contentions of the Department made on this appeal.

The judgment is reversed.

Friedman, Acting P. J., and Paras, J., concurred.

A petition for a rehearing was denied October 12, 1976, and respondents' petition for a hearing by the Supreme Court was denied November 18, 1976.