[Civ. No. 16269.   First Dist., Div. Two.   Jan. 21, 1955.]

CHARLES W. SUDDUTH, Appellant, v. CALIFORNIA EMPLOYMENT STABILIZATION COMMISSION et al., Respondents.

O'Hara, Randall, Castagnetto & Kilpatrick, Ellis R. Randall and Robert L. Leggett for Appellant.

Edmund G. Brown, Attorney General, Irving H. Perluss, Assistant Attorney General, William L. Shaw and Vincent P. Lafferty, Deputy Attorneys General, for Respondents.

KAUFMAN, J.—This is an appeal by Charles W. Sudduth from a judgment of the Superior Court in and for the County of San Francisco in favor of respondent California Employment Stabilization Commission and the members thereof after trial by the court. Plaintiff and appellant filed this action for the recovery of taxes in the sum of $4,874.85, plus accrued interest, paid under protest pursuant to the California Unemployment Insurance Act for the period April 1, 1948, through June 30, 1951. It is conceded that appellant exhausted his administrative remedies prior to filing suit.

Sudduth, who was the owner. of the Kirby Company in Sacramento, which sold and distributed Kirby Vacuum Cleaners, contended that an independent contractor status existed between himself and certain salesmen or dealers engaged by him to sell Kirby Vacuum Cleaners to the general public. The commission contended that those persons were employees and the tax contributions under the Unemployment Insurance Act were payable by appellant upon their earnings.

At the trial, the referee's transcript of the administrative

hearings was received in evidence. Attached to the answer were Exhibits A and B Tax Decisions 1523 and 1600, the final decisions of the Unemployment Insurance Appeal Board.

Appellant held the distributorship rights from the manufacturer of the Kirby vacuum cleaner for its sale in Sacramento and 15 counties in the central part of California. Salesmen who were designated "dealers" were engaged through newspaper advertising and personal contacts. Each dealer entered into a written contract with appellant which was entitled "Dealer's Agreement." This contract provided that the distributor would sell to the dealer his requirements of Kirby products, accessories, supplies, etc., at the prices set forth in the distributors' price list at the time of delivery of the products to him.

Other principal provisions of the agreement were as follows:

"B. The Dealer will pay the Distributor cash on delivery for parts, supplies, and accessories; may either pay the Distributor cash on delivery for Kirby Cleaners and other complete devices or purchase the same on open account; and shall bear all expenses, taxes, license fees, and other charges incurred in the resale of such merchandise.

"C. The distributor will extend credit to the dealer on open account only in accordance with the Distributor's credit system.

"D. The Dealer is and will continue to be an independent merchant and is not to be considered in any way subject to control by the Distributor. He is not and is never to be an agent or employee of the Distributor, and he shall have no power or authority to pledge or attempt to pledge or to bind or obligate the Distributor in any manner or for any purpose. The Distributor shall not furnish him with stationery, transportation, clerical or secretarial help, or office or desk space, expenses, or advertising expenses; guarantee any amounts to him or permit him to have a drawing account or any advance from the Distributor, except merchandise purchased on open account in accordance with the Distributor's credit system. The Distributor has no right to and shall not require him to attend at any place or time for any purpose; to devote any particular time or hours to his business; to confine his activities to any particular type of customers or any particular territory; to follow schedules, routes, or itineraries; to make reports of any character or follow leads; to make collections of accounts or check credit standings, or the like; or to refrain from engaging in any other type of business.

"E. As security and in good faith for the performance of this agreement and compliance with the Distributor's credit regulations, the Dealer will furnish the Distributor with bond, or a letter of credit, conditioned to secure him against loss from Dealer's breach of this agreement or failure to comply with the Distributor's credit regulations, and will maintain said bond or letter of credit at his own expense during the life of this agreement.

"F. As further security and good faith for the performance of this agreement and compliance with the Distributor's credit rules, the Dealer hereby sells and assigns to the Distributor the entire proceeds of the resale of all merchandise purchased by him from the Distributor on open account; hereby grants the Distributor a first and best lien on all merchandise purchased on open account by him from the Distributor and on the proceeds of its resale; and hereby authorizes the Distributor or his representatives, to enforce said lien and to transfer and collect the proceeds of said resale by him; all as security to the Distributor against any loss from breach by him of this agreement or said credit regulations.

"G. This agreement shall continue in force for a period of one year from date hereof, and thereafter from month to month, unless terminated by thirty days' written notice of one party to the other; but the Distributor may terminate this agreement at any time on breach of the provisions of Paragraph 'E' or the occurrence of any event entitling the Distributor to recover thereunder, or if during any thirty-day period the Dealer has not paid the Distributor in cash or by delivery of the proceeds of resale thereof for at least one Kirby Cleaner.

"H. The Dealer has read this agreement carefully, and understands that his relations with the Distributor are to be covered solely by the provisions of this agreement, one copy of which he has retained."

Beginning in 1951, appellant and the dealers executed an additional agreement entitled "Dealers Repurchase Agreement." Prior to 1951, oral agreements substantially the same as the written repurchase agreement had been in effect. Under this agreement the distributor agreed to purchase "acceptable conditional sales contracts and/or promissory notes secured by chattel mortgages and/or leases, together with accompanying agreements and other documents (hereinafter referred to as 'contracts') representing sales or lease

of new merchandise by Dealer," under certain terms and conditions subsequently stated in minute detail. The dealer agreed that all contracts offered to the distributor would be on the form approved by the distributor; that the down payments made by purchasers or lessees on such contracts had been made in cash and not its equivalent and that no part thereof had been loaned directly or indirectly by the dealer to the purchasers or lessees. The dealer agreed to provide and maintain service on all merchandise subject to the agreement in accordance with practices and policies established by the manufacturer and/or distributor. All contracts purchased by the distributor were to be without recourse except those becoming delinquent for a period of 65 days, in which case the dealer agreed to pay the balance on demand to the distributor. It was provided that the agreed purchase price was to be paid to the dealer or credited to his account when the paper was purchased, whereupon full title to the paper would pass to the distributor. Paragraph 6 of the agreement covered details in case of bankruptcy or insolvency of a dealer. Paragraph 7 provided that the distributor was under no obligation to notify the dealer of any default on the dealer's part or on the part of purchasers under contracts sold by the dealer to the distributor and the distributor might "make any compromise or adjustment that may seem reasonable to it with the purchasers or lessees named in the aforementioned contracts without consent of dealer and without in any manner affecting the guaranty of dealer herein contained."

In paragraph 9 the dealer agreed not to accept payments under any contract that had been sold to the distributor, but was to refer such purchaser to the distributor. This agreement might be terminated by either party by notice in writing to the other at any time.

Persons who applied to appellant to become dealers received a demonstration of the Kirby products and were given an aptitude test. If an applicant was accepted he was trained in the operation of the machine and in sales methods for a period of from one to three days. Instructions were given on the completion of sales contracts and credit statements. The forms were provided by a banking concern.

When the period of training was completed the new dealer was accompanied by an experienced salesman designated as a "trainer" for a day or two. As a rule he then became a member of a group or crew consisting of from four to

12 men. This group or crew had one person known as a trainer, crew chief, crew leader or crew manager who was responsible for training the field men as to sales methods and presentation. The territories being worked by the various crews and the dates were shown by a map on the wall in the office of appellant.

Dealers were furnished business cards bearing the name, address and telephone number of appellant, on which they could write, stamp, or have printed their own names and telephone numbers. The designation of "dealer" did not appear on this card. Dealers' kits were available to the men if they wished to use them. They paid $5.00 for them, and received that amount back from the company when they were turned in.

A room was furnished for training sessions and meetings. Many of the groups worked from appointment schedules made by girls who made the initial contacts with customers for the dealers. The men in each crew contributed to pay the cost of employing these girls. The girls received whatever training was necessary from a crew chief or trainer.

In the meeting room there were blackboards and bulletin boards on which contests were announced and scores kept. Appellant maintained a radio quiz program at his own expense which was devoted to advertising Kirby products, and which facilitated the securing of appointments for demonstrations. The dealers were not compelled to attend the morning meetings which were held between 8 and 9 a. m., but it was emphasized that they would be greatly benefited by such attendance. Appellant stated that an attendance of two-thirds of the dealers at such meetings was considered excellent.

Dealers furnished their own cars and gas and oil. They were not required to put in any certain number of hours, and they could engage in other work while under contract to appellant.

The provisions in the "Dealers Agreement" pertaining to bonds, letters of credit and minimum number of sales were not enforced.

A dealer was consigned a machine and his account was charged with it when he took one out in the field. Beginning dealers were allowed to take out only one machine at a time. Some dealers who were well established with appellant were allowed to take out several at one time. A dealer could pay cash, but this rarely occurred. The dealer's account was

credited when he turned in proceeds of a cash sale, returned the equipment or turned over to appellant contracts of sales of equipment. A lower price was set to the dealer as he sold more equipment. Sales contracts which were turned over to appellant were usually discounted at the bank, but in some instances appellant himself financed them. If a customer defaulted before the first three payments were made, the dealer incurred some of the loss, but if after the third payment the appellant suffered the remaining loss.

It is emphasized by respondent that sales by the dealers were financed through the Bank of America at Sacramento under the name of appellant as distributor. Respondent's Exhibit "D" in evidence, a finance agreement, is signed by only two parties, Sudduth as owner-seller, and the bank as financier. This agreement designates appellant as the seller of all vacuum cleaners to be financed by the bank.

All sales taxes on vacuum cleaners sold by the dealers were reported to the state under one name, the Kirby Company of Sacramento. Appellant explained that he did this for the convenience of the Board of Equalization, indicating that said board preferred one report to several separate small reports that might be difficult to locate.

Appellant admitted that the trainers or crew chiefs were his employees during the hours they were instructing other dealers. He testified that he maintained a ratio of one trainer to every five to 10 dealers in the field.

Appellant maintained a permanent service department to handle complaints from customers. Dealers were not responsible for handling any complaints on equipment or servicing. If ever any such service was rendered by them, it was purely on a volunteer basis.

There is no reference to workmen's compensation in either the dealer's agreement or dealers repurchase agreement.

The trial court found that appellant engaged the services of the dealers in an employment relationship; that said dealers were controlled in the existing employment relationship in all material details of their rendition of services, and that at no time was there a status of independent contract between appellant and the dealers; and that the tax was therefore properly imposed on appellant by respondent.

Appellant contends that the Kirby dealers were clearly independent contractors and hence excluded from coverage under the Unemployment Insurance Act. The Unemployment Insurance Code provides in section 601 that " 'Employment,'

means service, including service in interstate commerce, performed for wages or under any contract of hire, written or oral, express or implied." The section is substantially the same as section 6.5 of Deering's General Laws, Act 8780d, which was interpreted in *Bemis* v. *People,* 109 Cal.App.2d 253 [240 P.2d 638]. ■ That case noted that the Supreme Court cases of this state have adopted the rule that the common law distinction between servant and independent contractor, that is, the distinction based upon the right of control is the test to be applied under the act. And that question is primarily one of fact. However, in *Isenberg* v. *California Emp. Stab. Com.,* 30 Cal.2d 34 [180 P.2d 11], it was said that when the evidence is not in conflict and not reasonably susceptible of conflicting inferences, then the contention that the question of whether or not a person is an employee under the Unemployment Insurance Act is wholly one of fact, is untenable. The court there pointed out that if such were the rule, various trial courts under identical facts might make conflicting interpretations, thus making effective enforcement of the act impossible. It was noted that in public law cases uniformity of decision is important, and where essential facts are not in conflict the question of the legal relations arising therefrom is a question of law.

Under the rules of these cases, in order to reverse the judgment of the trial court, appellant must show that the trial court's finding of an employment relationship is unsupported, and that the evidence herein is not in conflict, is not reasonably subject to conflicting inferences, and as a matter of law supports only a finding of an independent contract status.

■ It is established that in this type of case, the burden of proof is on the party seeking to recover a tax to prove that it has been illegally assessed. (*Isenberg* v. *California Emp. Stab. Com., supra*; *Robinson* v. *George,* 16 Cal.2d 238, 244 [105 P.2d 914].)

■ In the leading case of *Empire Star Mines Co.* v. *California Emp. Com.,* 28 Cal.2d 33, 43 [168 P.2d 686], it is said that in determining whether one who performs services for another is an employee or an independent contractor, "the most important factor is the right to control the manner and means of accomplishing the result desired. If the employer has the authority to exercise complete control, whether or not that right is exercised with respect to all details, an employer-employee relationship exists. ■ Strong evidence

in support of an employment relationship is the right to discharge at will, without cause.'' ■ The cited case then proceeds to lay down certain secondary factors which are to be taken into consideration in studying the relationship: (1) whether the one performing services is engaged in a distinct occupation or business; (2) the kind of occupation, with reference to whether it is usually done by a specialist without supervision or under the direction of a principal; (3) the skill required in the particular occupation; (4) whether principal or workman supplied the tools, instrumentalities and place of work; (5) length of time for which services are to be performed; method of payment, whether by time or by the job; (6) whether or not the work is part of the regular business of the principal; (7) whether or not the parties believe they are creating the relationship of employer-employee.

■ Applying the tests of the Empire Star Mines' case, it can readily be seen from the facts heretofore narrated, that the evidence is certainly subject to the inference that appellant maintained control of the dealers in the methods of carrying on their work through the medium of the trainers or crew chiefs who were, while acting in such capacity, admittedly employees. Thus the detail of the work of the less skilled dealers, insofar as it is feasible to control a type of service involving salesmanship in house to house canvassing, was controlled by appellant through the trainers in the field, and through group meetings in his office. Equipment to be sold was secured piece by piece from appellant's establishment. New dealers could take only one, and the average dealer who was better established with the company would take usually two or three vacuum cleaners.

The salesmen or dealers herein were not engaged in an occupation or business distinct from that of the appellant, but were the instruments by which he achieved the sale of the product of which he was distributor. A review of the background of the dealers reveals that no great skill was required to engage in this occupation. On the job training was relied on to develop the skill of the dealers.

Some of the factors, such as the fact of payment on the basis of each piece of equipment sold, the payment of the "appointment girls" by the dealers, the freedom of the dealers as to the hours which they worked, and the testimony of certain witnesses that they believed that the dealers were independent contractors, as well as the statement to that effect

in the "Dealers Agreement," all point, it is true, more toward the status of independent contractor than employee. However, these are merely conflicting factors in the evidence which were weighed by the trial judge and found not to outweigh the factors pointing toward an employment relationship.

Although the dealer's agreement provided that the contract was to continue in force for a period of one year from date, and thereafter from month to month unless terminated by 30 days' written notice of either party, the distributor could terminate at any time for breach of paragraph E. Paragraph E provided that dealers were to furnish a bond or letter of credit to the distributor, and the evidence showed that this was never done. Respondent points out that appellant in effect could therefore terminate the agreement with any dealer at any time as none of them had complied with paragraph E.

Appellant cites *Garrison* v. *State,* 64 Cal.App.2d 820 [149 P.2d 711], *California Emp. Stab. Com.* v. *Morris,* 28 Cal.2d 812 [172 P.2d 497], and *California Emp. Stab. Com.* v. *Norins Realty Co.,* 29 Cal.2d 419 [175 P.2d 217], to the effect that a commission salesman relationship is not inconsistent with an independent contractor relationship. In the Garrison case, district agents of an insurance company were held to be independent contractors, and that decision was affirmed on appeal. In the other two cases cited certain real estate salesmen were held to be independent contractors and those decisions were affirmed. It might very well be held under different circumstances that real estate salesmen are employees. In fact, in *California Emp. Stab. Com.* v. *Morris, supra,* it was said (p. 818) that "the occupation of real estate salesman, insofar as the Unemployment Insurance Act is concerned, is one that may be classified as that of employee, or an independent contractor, depending upon the facts of the particular case."

Appellant reviews several other cases, arguing as to each that the facts are substantially similar where an independent contractor relationship has been upheld, and substantially different where an employment relationship has been upheld. It would serve no useful purpose to discuss these cases in detail for each case must be decided on its own facts. The instant case is not exactly parallel on its facts to any of the cited cases.

In his reply brief appellant contends that respondent by his argument in the trial court, which is repeated in his brief

on appeal, misled the trial court as to the nature of the review involved, and that the trial court consequently did not exercise its independent judgment on the facts. We must presume that the trial court regularly performed its duty to exercise an independent judgment on the entire record before it. It is true that respondent states in its brief that the issue before this court may be whether or not the weight of the evidence in the referee's transcript and in the stipulated facts set forth in Tax Decision No. 1523 supports the final administrative ruling. The issue here, however, is whether the entire record supports the findings of the trial judge in the exercise of his independent judgment that an employer-employee relationship existed.

It appears from our review of the record herein, that the trial court's finding of the employment relationship between appellant and the dealers is supported by substantial evidence.

Judgment affirmed.

Nourse, P. J., and Dooling, J., concurred.