[Civ. No. 21205.   Second Dist., Div. One.   Mar. 5, 1956.]

JOHN S. BEVAN, Respondent, v. CALIFORNIA EMPLOYMENT STABILIZATION COMMISSION et al., Defendants; WILLIAM A. BURKETT, as Director of Employment, etc., et al., Appellants.

Edmund G. Brown, Attorney General, Irving H. Perluss, Assistant Attorney General, and N. B. Peek, Deputy Attorney General, for Appellants.

William Crum for Respondent.

FOURT, J.—This is an appeal from a judgment of the superior court in favor of plaintiff and respondent, John S. Bevan, sometimes hereinafter referred to as Bevan, against William A. Burkett, former Director of Employment of the State of California,[1] and the Department of Employment of the State of California (for convenience both defendants are sometimes hereinafter referred to as defendant), rendered in an action brought to recover unemployment insurance contributions, interests and penalties totaling $3,049.72, paid under protest pursuant to the provisions of the former California Unemployment Insurance Act,[2] hereinafter referred to as the Act, for the period August 15, 1948, through June 30, 1950.

---

[1] Subsequent to the filing of this appeal, defendant Burkett was succeeded in the Office of Director of Employment by Harry W. Stewart, who is now the duly appointed and acting Director of Employment of the State of California.

[2] The California Unemployment Insurance Act (Stats. 1935, chap. 352; Deering's Gen. Laws, Act 8780d), was repealed and superseded by the enactment of the California Unemployment Insurance Code, sometimes hereinafter referred to as the Code, effective January 1, 1954 (Stats. 1953, chap. 308). The provisions of the code are substantially the same as those of the former act.

On December 11, 1950, the defendant levied an assessment against Bevan based upon the premise that certain persons who sold Kirby vacuum cleaners were his employees.

Following a protest payment of said assessment, Bevan filed with defendant a claim for refund asserting, among other things, that said persons were independent contractors in that he did not have the right to control the manner or means of their sales activities and that said persons were accountable only as to the results obtained.

The claim for refund was denied, and Bevan having properly exhausted all administrative remedies, filed the action now under consideration.

The court below found that the persons associated with plaintiff were independent contractors rather than employees and hence were not subject to the provisions of the Act.

It is conceded by appellant that the act did not require the payment of contributions in those cases involving independent contractors, but applied only to an employer-employee relationship.

A fair résumé of the facts of the case is as follows: During the period from August 1, 1948, to June 30, 1950, Bevan was the owner of Kirby of Pasadena and held the rights of distributorship from Scott-Fetzer, the manufacturers of the Kirby vacuum cleaner, for its sale in Pasadena and surrounding communities. To sell the vacuum cleaners Bevan had a sales organization consisting generally of a sales manager, several crew managers, and salesmen. From November, 1949, to the end of the period involved, Bevan employed a woman office manager. In addition, from January, 1950, to June, 1950, Bevan employed four women canvassers. There were usually one sales manager, two crew managers during the first part of the period involved and four or five during the later portion, and four or five salesmen working with each crew manager. On an average, Bevan engaged from 20 to 30 salesmen a month, and during the entire period he engaged between 150 and 200 men.

It was conceded before the start of the trial that the sales manager should be considered an employee, and there was no issue as to the women canvassers who worked during a portion of the time under discussion.

From August, 1948, to February, 1949, and from September, 1949, to June, 1950, Bevan had an oral arrangement with his salesmen. During the interval from February, 1949, to Sep-

tember, 1949, Bevan operated under a written contract[3] with them, although only about 50 per cent of the salesmen actually signed the agreement and there was no strict compliance with its terms by those who did.

[3]"KIRBY SALES DEALER AGREEMENT

"Upon our acceptance of you as a KIRBY SALES DEALER you will be assigned to a Field Manager. The Field Manager to whom you are assigned will furnish you with all essential demonstrating equipment at all times.

"EQUIPMENT FURNISHED AND IT'S VALUE

| | |
|---|---|
| 1 Dirt Meter .......................................$ | 5.00 |
| 1 Black Kirby Demo Book .......................... | 2.50 |
| 1 Blue Sales Instruction Book ...................... | 1.25 |
| Demo Crystals, Dirt Papers, Sales Books, Forms, Etc. ............................. | 1.25 |
| | $10.00 |
| 1 Kirby Home Renovation System C/W Power Polisher ........................... | 119.95 |
| Total .. ...........................$ | $129.95 |

"The above equipment is furnished to you by KIRBY OF PASADENA or one of its branch distributors.

"The sum of ten dollars ($10.00) is required for bonding purposes at the time equipment is issued. The $10.00 is the only money requirement needed by you to become a KIRBY SALES DEALER.

"We train you in the basic arts of direct selling, such as:

You will have two and one half days inside training plus the same in the field. Your training will be under the direct supervision of one of our experienced men. The training will consist of the various uses of the KIRBY and instruction in handling.

How to intelligently show and converse with the client. Field training will also be under direct supervision of one of our experienced men. He will show you how to approach homes and after gaining admittance how to properly conduct yourself in order to gain a sale.

How to qualify the client in various ways, how to look for and expect a sale.

"The remuneration for the sale of a KIRBY is Twenty Five Dollars ($25.00) per sale. The commission is paid to you every Wednesday morning.

"From our experience it has been found that a Sales Dealer should endeavour to demonstrate in at least three homes every day and at least three or more night demonstrations per week.

"We are so convinced of the great importance of demonstrating that we offer this additional bonus for weekly demonstrations:

| | |
|---|---|
| "12 to 17 Demonstrations per Sale per week | $5.00 |
| "18 Plus " " " " " | 7.50 |

"The above Bonus payments are made monthly and are additional to the payment for each sale. For example: If you have put on TWELVE Demonstrations and ONE Sale you will receive $25.00 plus $5.00. BONUSES ARE PAID ONLY IF SALES ARE MADE.

"After completion of your training you will be assigned to a Field Manager. Your Field Manager will assign you to the territory you are to work in and keep you furnished with the proper equipment at all times.

The method of operation of the salesmen under the written agreement was substantially the same as that under the oral arrangement, except for the last six months of the period involved when Bevan employed the women canvassers. In addition, the terms of the relationship between Bevan and the salesmen were substantially the same throughout the entire period involved. There was an oral arrangement between Bevan and his crew managers for the entire period involved.

Salesmen were usually obtained by Bevan through advertising in the "help wanted" columns of newspapers and by means of personal contacts. In addition, Bevan used the placement facilities of the defendant, Department of Employment of the State of California, to secure salesmen, although the record does not show for what portion of the period in-

---

Any problems which arise may be corrected by consulting your Field Manager who will be in your working area, or if he is absent his assistant will be in the area.

"When a sale is completed the various forms are to be turned in to your Field Manager along with all monies. On any payments that are made by check the check is to be made out to KIRBY OF PASADENA, not to you personally.

"A Sales Meeting is held Monday through Saturday from 8:30 to 9:00 A.M. to help you in your daily work. All men are expected to attend and if for any legitimate reason you cannot, please inform your Field Manager by phone. If for any reason you are going out of town or you cannot be at work for one or more days we ask to be informed. If you are to be gone for a week or longer either on vacation or various other reasons ALL EQUIPMENT IS TO BE TURNED IN and upon your return you will receive a re-issue.

"Equipment is issued from 9:00 to 9:15 A.M. daily by your Field Manager.

"Contacts and Demonstrations should be made between 9:15 A.M. and 4 P.M. and evening demonstrations should be made from 7 P.M. on. Callbacks should be made after 4 P.M.

"KIRBY OF PASADENA OR ANY OF ITS BRANCH DISTRIBUTORS RESERVE THE RIGHT TO ASK YOU FOR YOUR EQUIPMENT AT ANY TIME THAT IT IS FELT YOU ARE NOT IN ACCORD WITH THE POLICY OF OUR ORGANIZATION AND THAT ANY MONEY PAYABLE TO YOU WILL BE WITHHELD UNTIL PROPER CLEARANCE IS MADE OF ALL OF YOUR ACCOUNTS.

"At the termination of duties with this organization the equipment is to be returned to us. You will then be issued a 'clearance letter' properly endorsed relieving you of any and all responsibilities. This letter will permit you to seek sales work with any KIRBY distributor.

"KIRBY OF PASADENA

By⸺⸺⸺⸺⸺⸺⸺⸺
John S. Bevan

"⸺⸺⸺⸺⸺⸺
SALES DEALER

"⸺⸺⸺⸺⸺⸺
FIELD MANAGER

"THE PRECEDING RULES ARE SUBJECT TO CHANGE"

volved he availed himself of this employment service of the State of California. The newspaper ads usually stated that those who were interested in securing work should report to the Green Hotel, Pasadena, for an interview. During this meeting at the hotel, Bevan or his sales manager would explain the nature of the job, give a demonstration of the Kirby machine, administer an aptitude test, and inform the men of the terms of the arrangement. Apparently Bevan had difficulty in securing men, and he gave the test to make ''our job look important to them.'' Those whom he engaged were told to report to his office, which was at 749 North Marengo, Pasadena, from August, 1948, to about June, 1949, and at 25 North Santa Anita, Pasadena, from June, 1949, through June, 1950. Most of the men had no previous experience in selling vacuum cleaners. Each man usually underwent a training program of from two to five days, during which he was instructed as to the operation of the machine and the completion of conditional sales contracts which were furnished by Bevan. At the completion of this training period, each salesman was issued a Kirby vacuum cleaner, dirt meter, Kirby demonstration book, demonstration crystals, dirt papers, forms, and, for a portion of the period involved, a sales instruction book.

It appears that generally speaking after the salesman had joined a crew, he was accompanied by his field or crew manager or other experienced salesman for the first few days in order to obtain practical experience in house-to-house selling. Ordinarily, the salesmen worked in the same general area that their crew managers were working. And the crew managers would ''suggest'' the territory in which their crews would work. However, a salesman could work alone and some did. Also, a salesman could go anywhere in the territory of Bevan's distributorship, except in an area being worked by a subdealer whose methods of operation were entirely different from those of the crew managers or salesmen. While a salesman was prohibited by Bevan from engaging in general selling outside his distributorship territory, a salesman could, by virtue of a reciprocal agreement between Bevan and other Kirby distributors, follow a lead in another distributor's territory.

The salesmen were instructed to take any problems they had to their crew managers. In Bevan's words, the crew or field manager was ''the man that was the overseer in the

field.'' In this connection, plaintiff's witness, Robinson, a crew manager, testified on cross-examination that he would possibly see each member of his crew two or three times a day to determine how they were getting along. The crew managers told members of their crew that if they ever had any trouble in making a sale, they could always call on them for help, and Robinson testified that he helped some of his crew ''close deals.'' No specific territory was assigned to a crew manager, but the crew managers had a general knowledge of where each crew was working, and, except for the latter portion of the period involved when Bevan employed canvassers, the crews generally worked in different areas.

As previously indicated, Bevan's sales organization during the major portion of the period involved, consisted generally of a sales manager, crew managers and salesmen. A Mr. Fred Pape was sales manager from about November, 1948, to November, 1949, and from January, 1950, to June, 1950, C. Warren Sawyer held the position. During the time from August, 1948, to November, 1948, and November, 1949, to January, 1950, Bevan acted as his own sales manager. In the course of the trial it was stipulated that Pape and Sawyer were employees of Bevan, and their earnings were subject to tax under the Act.

The sales manager helped Bevan procure and train salesmen. In addition, he would ''suggest'' to salesmen that they should work with certain crews. Bevan paid the sales manager by giving him an overriding commission on every sale made by a crew manager or salesman.

The crew managers, who also sold machines in the same manner as the salesman, were selected from salesmen who had demonstrated superior sales ability, and this possibility of promotion was held out to them as a reward for those who had an above-average record of sales. In fact, Mr. Sawyer, Bevan's sales manager, worked his way up in Bevan's organization from salesman to crew manager to sales manager. As previously indicated, the crew managers trained the men in house-to-house selling, suggested places for their crew to work, acted as overseers, and gave assistance when asked for it.

In addition, the crew managers filed with Bevan or the sales manager a weekly report on the sales made by their salesmen. In order to understand their method of preparation and purpose, it is helpful to describe briefly the mechanics of selling a Kirby. Kirbys were sold either for cash or on credit

through conditional sales contracts. When a cash sale was made, the customer was given a cash receipt slip and the salesman kept two copies. A credit buyer executed in triplicate a conditional sales contract and the salesman retained the original and a copy. Once or twice a week, the salesman would turn over to his crew manager the cash proceeds from his sales together with the copies of cash receipt slips and the original conditional sales contracts, keeping a copy of each document for his records. From these documents the crew manager compiled a weekly report sheet for each salesman in his crew, which he submitted, together with the cash, cash receipt slips, and conditional sales contracts, to Bevan, keeping a carbon copy of the weekly report sheet for his records, to show the sales that a salesman had made during the week. These weekly reports enabled Bevan to determine the amount of commissions that each salesman was entitled to and the overriding commissions due the sales manager and the crew managers.

A machine was not sold but was issued to a crew manager or salesman, who would sign a receipt for it and a stock record was maintained by the office manager showing the number of machines that had been issued. Generally, salesmen were allowed to take out only one machine at a time, but the crew managers were permitted to take out several machines. A salesman was entitled to a commission of $25 for every machine (retail price—$119.95) he sold. Upon making a sale the salesman could either deduct his commission or turn it over to his crew manager. Every week Bevan would pay the salesman the total amount of his unpaid commissions, as shown by the weekly report. The salesman could take a trade-in as a down payment on a Kirby. He was not limited in the allowance he could give for the trade-in, it being necessary only that he turn over to his crew manager cash in the sum of $94.95, or a conditional sales contract that together with the down payment totaled $94.95, which was the difference between the sales price of $119.95 and his commission of $25. The trade-ins belonged to the salesman, and the salesmen could sell these second-hand machines in Bevan's territory at the same time that they were selling Kirby vacuum cleaners. The cash receipt slip did not bear the designation "salesman" or "sales dealer." All conditional sales contracts were executed in the name of Bevan as seller and he discounted them at his bank; there were no dealings between the bank and

the crew managers or salesmen. Bevan, pursuant to his arrangement with the bank, advised the crew managers and salesmen as to the required down payment and other credit terms. In case a buyer defaulted on his contract, Bevan would bear the full loss, and the salesman or crew manager would not lose any of his commission. The bank had full recourse against Bevan on every conditional sales contract. Bevan requested the crew managers and salesmen to have all checks given in payment for the machines drawn to the order of Kirby of Pasadena.

From January, 1950, to June, 1950, which was the last six months of the period involved, Bevan conducted, in conjunction with other Kirby distributors, a radio advertising program. As part of this program, women canvassers, hired as employees by Bevan, would canvass an area to secure appointments for demonstrations of the Kirby by the salesmen. The women canvassers would give the ''appointments'' to certain crew managers who would pass them on to members of their crew. The canvassers were assigned by Bevan, the sales manager, or the crew managers, to the general area to be canvassed, and the canvassers were taken to the area by the crew managers in their cars. During this canvassing operation, the crew managers cooperated as to the areas to be worked, and three or four crews sometimes would work together with the canvassers.

Appellants' counsel asked Bevan whether he or the crew managers designated the particular streets that the canvassers were going to work. The judge made and sustained an objection to the question on the ground that it was immaterial. Appellants made the offer of proof that the crew managers would designate the particular streets to be worked by the canvassers. Subsequently, defendant's witness, Krosky, a crew manager, testified without objection that he assigned the streets to the canvassers. The canvassers worked closely with the crews, and during this six-month period, most of the sales were made as a result of leads obtained by the canvassers. To help defray the cost of this advertising and canvassing program, $5.00 was deducted from every commission received from a sale obtained through a ''canvass lead.''

In addition, Bevan, during this same time, had a bonus coupon plan whereby a salesman or crew manager would give a coupon to a prospective purchaser which would entitle him to participate in a drawing for a machine.

With the sole exception of Robinson, a crew manager, who

inserted ads in his name at Christmas time, no crew manager or salesman did any advertising.

No capital investment was required from any salesman. For a very few months, salesmen were required to post a bond, and Bevan purchased some of these bonds for the salesmen who had been with him for a long time. Crew managers and salesmen were furnished business cards bearing Bevan's name, address and the telephone number of Kirby of Pasadena. Bevan had the names of the crew managers printed on the cards, but the names of the salesmen were not, although the card was "designed" for the salesman to place his name and home telephone number on it. Some placed this information, together with their home address, on Bevan's card, or provided their own cards. The designation "salesman" or "sales dealer" did not appear on Bevan's cards. Bevan did not furnish any stationery to the crew managers or salesmen. The crew managers and salesmen could use Bevan's office phone, but deductions were made from their commission for toll calls. Bevan gave some sales leads to the salesmen, but usually he would hand them to the crew managers, who in turn could give them to members of their crew. Salesmen were not required to follow leads. They would also obtain their own leads by paying $5.00 to any person that gave them a lead resulting in a sale, but they did not employ anyone to look for leads.

Salesmen received no expense account, drawing account or guarantee. They were compensated by commissions based on sales. However, a salesman did receive a Kirby machine as a bonus for every seven machines that he sold in a single calendar month.

Neither the crew managers nor the salesmen were required to report to Bevan's office nor to attend the sales meetings which were held at his office every morning between 8:30 and 9 a. m. Although the salesmen were encouraged to attend, very few did.

Salesmen were not required to submit any reports as to their activities, nor were they or the crew managers required to make credit investigations. The crew managers and salesmen furnished their own transportation. Those who had automobiles were not required to take out public liability insurance in favor of Bevan. The salesmen were not obligated to put in any certain number of hours, and were free to engage in other work. While some of the men did have other part-time jobs, most of them were engaged by Bevan on a

full-time basis. The salesmen or crew managers were not allowed to sell other new vacuum cleaners, but they could sell other second-hand machines received as trade-ins on new Kirbys.

Except for Reitz and Robinson, two crew managers, no crew manager or salesman had a separate place of business other than his home. In this regard it should be noted that salesman Lawrence Stanley, a blind man, had a separate place of business, but by stipulation Bevan and defendant excluded the commissions of $325 paid Stanley from May to June, 1950. Defendant apparently so stipulated because it believed that his method of operation was substantially different from that of the other crew managers or salesmen. Reitz and Robinson jointly had a separate headquarters in Highland Park for a short period of two or three months in the latter part of 1949 or the early part of 1950. They were, according to Bevan, the only crew managers who worked with the crew canvassers during the six-month period from January to June of 1950. Bevan filed a contribution return under the Act for the second quarter of 1950, reporting Robinson and Reitz, and certain salesmen as employees for the reason that these crew managers were "working very closely with the canvassers," and the salesmen were "assisting" the crew managers. No return was filed by Bevan reporting Reitz and Robinson or the other salesmen as employees under the Act for the first quarter of 1950.

All sales taxes on vacuum cleaners sold by the crew managers or salesmen were reported in Bevan's name. Bevan was obligated by his distributorship agreement to furnish a one-year service guarantee to purchasers of Kirbys. Bevan took care of the complaints and serviced most of the machines, but he did give some service calls to salesmen to handle. Bevan purchased all necessary city and county soliciting licenses for the crew managers and salesmen. He carried workmen's compensation insurance on the crew managers and salesmen. During the interview at the Green Hotel, Bevan told the men that they were independent operators, that they could come and go as they pleased, and that no deductions were to be made. Plaintiff's witness, Kirsan, a salesman, testified that Bevan told him he was going in business for himself.

Bevan had the right to terminate the services of the crew managers or salesmen at will. The crew managers and salesmen had the reciprocal right to terminate their services at

will. In fact, during the trial it was stipulated, in substance, by counsel for Bevan that there was no question that Bevan had the right to terminate at will.

On January 21, 1955, the District Court of Appeal, First Appellate District, Division Two, in the case of *Sudduth* v. *California Emp. Stab. Com.*, 130 Cal.App.2d 304 [278 P.2d 946], held, on facts substantially the same as presented here, that salesmen engaged by Kirby distributor Sudduth were employees under the Act, Sudduth having conceded that his crew managers were employees.

It would unduly extend this opinion to point out every instance wherein the facts of this case are substantially similar to the facts of the Sudduth case. However, it will be noted that in each instance their salesmen were secured and trained in an identical manner and a similar crew system was used by each of them. The cleaners were issued, sold, financed, and reported for state sales tax purposes in substantially the same way. The elements of freedom of operation inherent in this type of door-to-door selling were present in both cases, such as, not being required to attend sales meetings or follow leads, no minimum hours, no specific assignment of territory, and being free to engage in other work. In addition, neither Bevan nor Sudduth provided transportation, desk space, drawing account, guarantee or advances, but both furnished business cards. Both Bevan and Sudduth were responsible for taking care of customers' complaints and servicing their machines; however, Bevan gave some of his service calls to salesmen to handle while Sudduth's salesmen processed them only on a "volunteer basis."

Moreover, not only are the compared relationships substantially identical but also there is an additional important element strongly indicative of an employment relationship which is present here, but not found in the Sudduth case —Bevan had the right to terminate the services of a salesman at will, whereas Sudduth had a minimum one-year agreement with each salesman which could be terminated only for cause. And Bevan, unlike Sudduth, had the power, through the "clearance letter" to prevent a salesman from working for another Kirby distributor. Also, there are other essential factors present here which were absent in the Sudduth case— Bevan carried workmen's compensation on all his salesmen; he paid for all their city and county soliciting licenses; the conditional sales contracts were executed in the name of Bevan as seller, rather than that of the individual salesman; and

in case of a buyer's default on the conditional sales contract, Bevan bore the entire loss rather than only a portion thereof.

With respect to the crew managers, there is a difference between the two cases, for Sudduth conceded that they were employees, but Bevin did not, except for the second quarter of 1950, when he filed the return under the Act reporting crew managers Robinson and Reitz as employees. In view of Sudduth's concession as to the subject status of his crew managers, it was, of course, not necessary for the appellate court to set forth in detail their activities, but sufficient facts are stated in the district court's opinion to show that their primary function was the same as that of their counterparts in this case. Sudduth's crew managers were mainly responsible for training the salesmen "as to sales methods and presentation" in actual house-to-house canvassing. (*Sudduth* v. *California Emp. Stab. Com., supra,* 130 Cal.App.2d 304, 309.) Likewise, one of the principal duties of Bevan's crew managers was to see to it that the new salesmen received the same practical training in house-to-house selling, either from the crew manager himself or from one of the experienced salesmen in his crew. In addition, Bevan's crew managers were the persons to whom the salesmen looked for assistance with their problems, including the most important one of any salesman selling on a commission basis—the consummation of a sale. Also, every week the crew managers filed their "weekly report sheets" with Bevan, together with the cash proceeds and documents of sale turned over to them by their salesmen; and these reports enabled Bevan to determine the commissions due the salesmen and the overrides owed the sales manager and crew managers. It is evident that Bevan's crew managers received the overrides as compensation for acting ,in Bevan's words, as "the overseer in the field," and it is equally clear that through these crew managers Bevan maintained control of the activities of the salesmen "insofar as it is feasible to control a type of service involving salesmanship in house to house canvassing." (*Sudduth* v. *California Emp. Stab. Com., supra,* 130 Cal.App.2d 304, 312.)

A thorough reading of the Sudduth case will demonstrate further essential similarities.

Appellants contend that the undisputed evidence establishes as a matter of law that Bevan's crew managers and salesmen were employees under the act and that the trial court's holding that they were independent contractors is erroneous.

Neither the present code, nor the former act specifically defines the term employee. Thus section 9 of the act (now § 675 of the code) provided in general that an employer was a person who had in "employment" one or more individuals and paid wages in employment in excess of $100 during any calendar quarter. This term "employment" was defined by section 6.5 of the act (now §§ 601, 602 and 603 of the code) as "service, . . . performed for wages or any contract of hire, written or oral, express or implied." ■ However, it is now well established that "employment" in effect means employer-employee relationship and does not include an independent contractor. (*Bemis* v. *People*, 109 Cal.App.2d 253, 262-263 [240 P.2d 638] ; *Briggs* v. *California Emp. Com.*, 28 Cal.2d 50, 54 [168 P.2d 696].) Thus, as previously indicated, the basic issue in this case is whether or not the relationship of employer-employee existed between Bevan and his crew managers and salesmen during the period involved.

In the case of *Isenberg* v. *California Emp. Stab. Com.*, 30 Cal.2d 34 [180 P.2d 11], the plaintiff brought suit to recover contributions paid under protest on the remuneration received by free-lance jockeys performing services for plaintiff. The defendant appealed from a judgment in favor of the plaintiff. There was no conflict in the evidence concerning the terms under which the jockeys were hired. Likewise, there was no conflict as to the customs or practices of the owners with regard to the jockeys. On appeal, the Supreme Court reversed the decision on two grounds, setting forth in substance that the facts being undisputed, it was then a question of law whether liability arose therefrom and that as such, it was appropriate for the Supreme Court to review the facts. saying in this connection (at p. 40) : "The contention that the question whether a person is an employee under section 6.5 of the Unemployment Insurance Act is wholly one of fact, even when the evidence is not in conflict and not reasonably susceptible of conflicting inferences, is untenable. Under such a rule there would be nothing to prevent conflicting interpretations of identical facts by the various trial courts so that free-lance jockeys would sometimes be classified as employees and sometimes not. Such a rule would make effective enforcement of the Unemployment Insurance Act impossible."

The court further said, in the Isenberg case, that in *Drillon* v. *Industrial Acc. Com.* (1941), 17 Cal.2d 346 [110 P.2d 64], it had held on similar facts that jockeys were employees within

the meaning of the Workmen's Compensation Act, and held in effect that if a jockey were an employee under that Act, he would likewise be one under the Unemployment Insurance Act. The court stated, at pages 38-39, "In *Empire Star Mines Co.* v. *California Emp. Com.*, 28 Cal.2d 33, 43 [168 P.2d 686], this court set forth the rules for the determination of the question whether or not a person is an independent contractor or is engaged in employment under section 6.5. The principal test of the employment relationship was held to be the 'right to control over the manner and means of accomplishing the result desired.' Strong evidence of this right is shown by the right of the principal to discharge the worker. The secondary tests are listed in that opinion as including, '(a) whether or not the one performing service is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or workman supplies the instrumentalities, tools, and the place of work for the persons doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by time or by the job; (g) whether or not the work is a part of the regular business of the principal; (h) whether or not the parties believe they are creating the relationship of employer-employee. (Rest., Agency, § 220; Cal.Ann. § 220.)' "

The court concluded the opinion as follows (page 41):

"The result of the application of the rules of law set forth in *Empire Star Mines Co.* v. *California Emp. Com., supra,* will depend in any particular case on the essential facts of that case. Thus, in *California Emp. Com.* v. *Bates,* 24 Cal.2d 432, 436 [150 P.2d 192], the judgment of the trial court was reversed because the conclusion of the trial court from the facts was inconsistent with the decision in *California Emp. Com.* v. *Los Angeles Down Town Shopping News Corp.,* 24 Cal.2d 421, 425 [150 P.2d 186], where the facts were substantially the same. This holding is in accord with the rule, particularly applicable to public law cases where uniformity of decision is important, that if the essential facts are not in conflict the question of the legal relations arising therefrom is a question of law. [Citing cases.]"

The court in the case of *Malloy* v. *Fong,* 37 Cal.2d 356, 370 [232 P.2d 241], said:

"Whether a person performing work for another is an agent or an independent contractor depends primarily upon whether the one for whom the work is done has the legal right to control the activities of the alleged agent. (*Edwards* v. *Freeman,* 34 Cal.2d 589, 592, 593 [212 P.2d 883] ; *Empire Star Mines Co.* v. *California Emp. Com.,* 28 Cal.2d 33, 43 [168 P.2d 686].) The power of the principal to terminate the services of the agent gives him the means of controlling the agent's activities. 'The right to immediately discharge involves the right of control.' [Citing cases.] It is not essential that the right of control be exercised or that there be actual supervision of the work of the agent. The existence of the right of control and supervision establishes the existence of an agency relationship. (*Empire Star Mines Co.* v. *California Emp. Co.,* 28 Cal.2d 33, 43 [168 P.2d 686].) The evidence clearly supports the conclusion of the jury that such control existed in the present case. The right of the Presbytery to install and remove its ministers, to approve or disapprove their transfer to other jurisdictions, and to supervise and control the activities of the local churches, particularly those in the mission stage, is inconsistent with a contrary conclusion."

In this case Bevan had the right to terminate the services of his crew managers and salesmen at will. Having the power to discharge, he necessarily had the power to control practically all of the activities of those concerned. The fact that Bevan did not exercise the power makes no difference. The facts of this case and the facts of the Sudduth case are substantially the same, and therefore, under the rule of the Isenberg case, to avoid inconsistency in the decisions, we must hold that Bevan's salesmen were employees.

We further are of the opinion that as a matter of law, from the undisputed facts in this case, following the criteria set out in the Empire Mines case, *supra,* that Bevan's salesmen in question were employees and not independent contractors.

The judgment is reversed with directions that judgment be entered in favor of the defendant.

White, P. J., and Doran, J., concurred.