Raymond L. Wilkes, J.
When does the right to counsel accrue?
Between the Scylla of arrest and the Charybdis of arraignment lies this still burgeoning controversy of our time. Although Ulysses sailed successfully between his legendary perils it has long since become transparently clear that the philosophical pilgrimage of judicial interpretation relative to the foregoing query may not be quite so adroit. It seems rough strewn with the hazards of inconsistency, and the frustrations of an ever-embattled federalism. The mythological allusion only serves to symbolically illuminate the “ crime and the courts ” embroglio of this day and age.
Pursuant to our State law a voluntary confession is admissible in evidence unless a defendant is refused permission to see an attorney after he has requested one (People v. Donovan, 13 N Y 2d 148). The fact that a defendant is not advised of his right to remain silent or his right to counsel does not of itself invalidate his confession by State standards (People v. Gunner, 15 N Y 2d 226).
More recently, namely, on May 20, 1965, the United States Court of Appeals for the Third Circuit covering New Jersey, Pennsylvania and Delaware reversed two New Jersey murder convictions because the police had not advised the defendants prior to taking their confessions of: (1) their right to remain silent; and (2) their right to counsel (United States ex rel. Russo v. New Jersey and United States ex rel. Bisignano v. New Jersey). In so deciding, the Circuit Court extended the now historic decision of the Supreme Court of the United States in Escobedo v. Illinois (378 U. S. 478) in which the court reversed an Illinois conviction because the defendant had confessed to a murder after the police had refused to permit him *559 to see his attorney who was in the same station house as the defendant at the time of the defendant’s request. Since Danny Escobedo had requested counsel and had, in fact, already retained an attorney, the ruling of the court in his case left open the question as to whether or not a request was necessary and left somewhat ambiguous the question of whether the suspect had to be advised of his right to remain silent. On its literal facade the Escobedo decision appeared only to extend the right to counsel at the moment when police investigation “ has begun to focus on a particular suspect ” after a defendant had requested counsel. However, Justice Byrow White in his discerning dissent to Justice Goldberg’s majority opinion clearly illumined and indeed foreshadowed the possible future predilections of the majority of the court when he said (p. 495): “ Although the [majority] opinion purports to be limited to the facts of this case, it would be naive to think that the new constitutional right announced will depend upon whether the accused has retained his own counsel * * * or has asked to consult with counsel in the course of interrogation * ° * At the very least the Court holds that once the accused becomes a suspect and, presumably, is arrested, any admission made to the police thereafter is inadmissible in evidence unless the defendant has waived his right to counsel.”
In the most truly lay sense Escobedo was the first case in which the Supreme Court extended the right to counsel to a defendant while he was undergoing interrogation in a police station. It not only entitled the accused to counsel’s advice and aid in preparing for trial but in the words of Justice White (p. 496): “ stands as an impenetrable barrier to any interrogation once the accused has become a suspect ”, or as the majority of the courts so trenchantly concluded (p. 492): 1 ‘ when the process shifts from investigatory to accusatory ”. The Escobedo case did not touch upon the question of retroactivity leaving it to the lower courts to determine whether or not it applied to persons previously convicted when only coerced confessions were inadmissible.
The proliferation of problems and the diversity of decisions which have since ensued have found their ultimate distillation by some State courts limiting the Escobedo decision to its facts (People v. Gunner supra), (People v. Ordog and Rush, decided July 12, 1965, Supreme Ct., N. J.) by not requiring defendants to be advised of their constitutional rights to remain silent or of their right to counsel. Conversely in United States ex rel. Russo v. New Jersey and United States ex rel. Bisignano v. New Jersey the United States Circuit Court of Appeals for the *560 Third Circuit has .held precisely the contrary and has added the additional fillip of retroactivity to its fiat. In addition, the State of California in People v. Durado (62 Cal. 2d 350), had previously forthrightly espoused this latter Federal view.
The lid of the Pandora’s box which Escobedo left but slightly ajar has by now opened “ Wide as a church door and deep as a well.” The issue of federalism (the independence of the States in our Federal system of Government), long one of the wellsprings of the ever-emerging eminence of our Federal judiciary, has once again been raised at the empyrean levels of our law.
Fortunately, however, we endure and indeed persevere as a Nation under a system of law which is at once of marble constancy and yet infinite variety. We seem less concerned today about federalism and more about national ideals of elemental fairness. Mr. Justice Brennan of the United States Supreme Court indicated this difference in attitude during the course of an address which preceded the ruling of the Supreme Court in Mapp v. Ohio (367 U. S. 643) (the application of the Federal “exclusionary” rule controlling search and seizure to courts of State jurisdiction) when he said: “ Federalism should not be raised to the plane of an absolute nor the Bill of Rights be reduced to a precatory trust * * * Far too many cases come from the States to the Supreme Court presenting dismal pictures of official lawlessness, of illegal searches and seizures, illegal detentions attended by prolonged interrogation and coerced admissions of guilt, of the denial of counsel ”.
Contrawise, the Attorney General of the United States Nicholas de B. Katzenbach most recently eloquently espoused the understandably pragmatic view of those invested with the responsibility of law enforcement when he said in his correspondence with Judge David L. Bazelon of the United States Court of Appeals for the District of Columbia:
‘ ‘ It would be ridiculous to state that the overriding purpose of any criminal investigation is to insure equal treatment.
‘1 Regulation through judicial decision of investigation procedures should (not) have as its purpose to remedy all inequities which may exist in our society as a result of our social and economic and intellectual differences.
“ I have never understood why gangsters should be made the model and all others raised in the name of equality to his level of success in suppressing evidence. Because we cannot solve all crimes and cannot convict all criminals is no reason to release those guilty whom we can convict.”
In overemphasizing equality he said: ‘1 Judges have left the public behind ” and “ the most basic investigatory methods have *561 come to be questioned * * * as a result policemen, district attorneys and trial court judges have become increasingly unsure of the law.
“We are not so civilized that we can afford to abandon deterrence as a goal of our national law.”
There appears to be general agreement that the right to counsel should begin at the earliest possible moment and that adequate opportunity by police to interrogate persons who are suspected or accused of crime is absolutely essential to law enforcement. But the problem lies of course, as it does with so many other things in life as well as in the law, in its application— where to definitively draw the line of reprieve between arrest and arraignment, namely when is the earliest possible moment for the right to counsel to accrue for the benefit of a defendant.
Perhaps the answer lies in the still being explored area between arrest and a not too literal application of the rule laid down in Mallory v. United States (354 U. S. 449 [1957]), so as to avoid unreasonable delay in arraignment on the one hand and not “ paralyze the investigative process and eviscerate effective law enforcement ” on the other (quotation by Lumbard, Ch. J., in United States v. Vita [294 P. 2d 524, 532, (2d Cir., 1961.)]).
It is within the foregoing frame of reference that this problem finds its setting.
The operative facts of this pretrial Huntley hearing for the determination of the issues respecting the “voluntariness ” of the defendant’s alleged confession as defined in Jackson v. Denno (378 U. S. 368) without a jury in conformity with the procedure prescribed in People v. Huntley (15 N Y 2d 72) are as follows:
This prosecution of the defendant for the crime of indecent exposure pursuant to section 1140 of the Penal Law had its inception on March 12, 1965, at approximately 9:30 p.m., when Detectives George F. Burlison and James Clark arrived at the defendant’s home in Wantagh, Long Island, New York. They testified in substance that the defendant’s wife Wilma J. Frank answered the door — that they identified themselves as detectives from the Seventh Squad and asked if they could speak to the defendant alone. They further testified that they advised the defendant that they were investigating a complaint of indecent exposure, and that the defendant accompanied them to the Seventh Precinct located at Merrick Boad and Neptune Boulevard, Seaford, where they arrived with him at about 10 :00 p.m. At the precinct they advised the defendant that they had been given a license plate number by two girls relative to an exposure inci *562 dent near Jerusalem Avenue Junior High School, which checked out to his name and address. Detective Burlison testified that the defendant then admitted that he was the one who did it and the detective then asked the defendant if he wanted an attorney hut that the defendant said “ No ”. The defendant then telephoned his wife after which in response to Detective Burlison’s questions he gave a statement, of which Detective Burlison typed approximately 80% with the remainder being typed by Detective Arthur Holder — this latter part being the incriminating portion of said statement (People’s Exh. I). Detective Clark did not participate in the taking of the defendant’s statement having’ left the defendant in Detective Burlison’s custody after their arrival at the precinct. Defendant’s statement of approximately one and one-quarter pages in length was signed by the defendant and witnessed by Detectives Burlison and Holder.
During the voir dire by defendant’s counsel Detective Burlison testified that the defendant’s statement was signed between 10 and 10:30 p.m. on March 12, 1965, but that he did not put any time on the statement — that he could not say within a half hour or so of when it was taken except that he began his interrogation at approximately 10:00 p.m. However, after the witness testified that he had been a detective for approximately three months prior to the evening in question, he stated that he first saw the two female complainants between 10 and 10:30 p.m. that same evening and that defendant’s statement had not yet been signed when said complainants arrived. He further stated that when the defendant arrived at the precinct he was not under arrest — that he had come voluntarily. The witness ultimately testified that the defendant’s interrogation began sometime after 10:00 p.m. and that Ms statement was signed between 5,10 or 15 minutes prior to 11:48 p.m. His voir dire examination continued as he testified that he left the defendant’s home with the defendant around 10:00 p.m. — that he had been at defendant’s home approximately 15-20 minutes — that defendant’s wife became upset and the defendant consoled her before leaving. That perhaps an hour or an hour and a half ensued between the commencement of the defendant’s questioning and the taking of Ms statement. That both he and Detective Holder questioned the defendant before taking his statement and that he did not recall where his typing ended and Detective Holder’s began. That the typing of the statement began after they had been in the precinct about 1 to 1% hours. That Detective Holder had been a Detective for approximately 6 to 7 years prior to the night in question. The witness stated that it was at the beginning of Detective Holder’s typing that the defendant’s admission of guilt began. *563 He testified further that prior to leaving the defendant’s home the defendant’s wife did not say anything about calling an attorney and that although he knew the defendant’s wife was at the precinct he did not know when she arrived. He further testified during his voir dire examination that another statement, not previously mentioned by him, was taken by him and Detective Bolder and signed by the defendant that same evening. That the defendant’s arrest card was made out at 11:48 p.m., before leaving for police headquarters. That the defendant’s attorney telephoned the precinct — that the defendant told him he had just spoken to his attorney and that his attorney had told him not to sign anything, but that this took place after the first statement (People’s Exh. I) had been signed but prior to the signing of People’s Exhibit II (defendant’s second statement). The voir dire of this witness was concluded by his testimony to the effect that although he did not hear the defendant say to his wife over the phone “ get my lawyer right away ” — it was after the defendant had phoned his wife from the interrogation room that the telephone call came from the defendant’s attorney —■ that the defendant did not ask for an attorney at the precinct — that the defendant’s wife did not scream for an attorney at the precinct and that both statements were signed between 10:00 or 10:15 p.m. and 11:43 p.m. on March 12,1965.
Despite his extreme difficulty in recalling many aspects of time upon the evening in question, this witness was nevertheless quite specific in recollecting that the telephone call from the defendant’s attorney came after People’s Exhibit I had been signed by the defendant.
The witness concluded his cross-examination by stating that he advised the defendant several times that he could have an attorney.
Detective Clark’s direct testimony was mainly corroborative of Detective Burlison’s up to the point where they arrived at the precinct with the defendant, at which time after accompanying the defendant and Detective Burlison into an office he left on another assignment. He stated that the defendant’s wife said nothing about an attorney while they were at the defendant’s home. Under cross-examination he testified that when they were at the defendant’s home after the license plate number checked out to the defendant, they saw the black Plymouth in front of the defendant’s home and that they knew the defendant was their man when the defendant told them no one but he had been driving that car. He further testified that defendant was not advised that anything he said might be used against him while they were at the defendant’s home.
*564 Detective Arthur Golder testified that defendant’s attorney called after People’s Exhibit I had been signed and that the defendant had been there 1% hours when he first saw defendant’s wife. On cross-examination he said that defendant’s wife told him she had already called an attorney. That when the defendant first came to the station house he denied everything for about 20 minutes. Detective Golder did not recall at what time he began to type or at what time the typing of the statements People’s Exhibit I and II was completed, but he too did remember positively that the defendant’s attorney telephoned after People’s Exhibit I had been signed by the defendant. He further testified that Detective Burlison typed People’s Exhibit II and that there was no admission of any crime in that portion of People’s Exhibit I typed by Detective Burlison.
Detective Sergeant Robert Murphy in marked contrast to the two witnesses who preceded him testified that he saw defendant at the precinct between 9:00 and 9:30 p.m. That he received a phone call from the defendant’s wife and that he told her that the defendant was at the precinct, that he had been arrested, and that he had made an admission. That this call came approximately 15 minutes after the defendant had signed a statement. That the defendant’s wife arrived about 15 minutes later with an infant. That the defendant did not see his wife until shortly after 11:00 p.m. That at about 9:30 to 9:45 p.m. Detective Burlison typed the statement and defendant signed it all before 10:00 p.m. Detective Murphy further stated that he received a telephone call from the defendant’s wife about 9:45 p.m. and that she arrived within 15 minutes thereafter, but that the defendant had finished giving his statement before his wife’s 9:45 p.m. call. That Detective Burlison typed People’s Exhibit I down to the word “ over ”, eight lines from the bottom of the first page and that he learned of the call of defendant’s attorney from others. To put it somewhat euphemistically, the chronology of this witness’ testimony was substantially at variance with that of his brother officers.
The defendant’s wife Mrs. Wilma J. Frank testified in his behalf that she got hysterical when Detectives Burlison and Clark told her that the defendant would have to come with them. She testified that after the defendant had taken her into the den of their home and told her that someone said he had exposed himself, she asked the detectives if she should call a lawyer and they responded that an attorney was not needed — at least not until morning. She went on to state that sometime after 9:00 p.m. the defendant telephoned from the precinct and asked her to call a Mr. Danner, an attorney, which she did. That she called *565 the Seventh Precinct and was disconnected hut that she called again and spoke to a Sergeant Murphy who told her that it looked as though her husband was going to be arrested, and that she “ could not see him now She thereupon took her young daughter with her to the precinct where they arrived at about 9:45 p.m. when she spoke to Sergeant Murphy and told him that she had called an attorney. She said that when Detective Golder came out she asked him if she could see the defendant but that he said: “No we’re taking a statement”, and at that time Detective G-older further stated that the attorney had called and that the defendant did not wish to see her. She testified that she ultimately saw the defendant in the hallway and Sergeant Murphy took them to a room where the defendant told her that they made him say it — that they said: “ Tell us what we want to know or we ’ll hang you ’ ’. That after Sergeant Murphy told her about bail she went home with her daughter and called Mr. Danner, the attorney, who told her that he had called the precinct and advised the defendant not to sign anything and that he would see her in court in the morning. She concluded her direct testimony by stating that when Detectives Burlison and Clark came to her home the night in question that there was no conversation with regard to the defendant’s rights. Her cross-examination did not materially alter the basic tenor of her direct testimony.
With all due deference to the commendable as well as the understandable desire of the defendant’s wife to be helpful to his cause, it is not her testimony alone which provides the fulcrum upon which his cause must turn in this hearing. Bather, in the end, it is those portions of the testimony upon which all of the witnesses agree, namely: (1) that the defendant’s attorney did telephone the precinct the night his statement was taken, and (2) that the defendant’s wife was present in the precinct while he was being interrogated. These are the elements which constitute the arena of resolution herein.
Memory is at best a fragile thing but it does not always serve one well to recall only what best suits his purpose. The reasonable probabilities of circumstance do not often lend themselves to such purpose. Without the need for a critique upon the subject, that is my view of the People’s testimony, with respect to when the defendant’s attorney telephoned the precinct insofar as that call bears upon the taking of People’s Exhibit I with all its poignancy of application to People v. Gunner (15 N Y 2d 226, supra).
The defendant’s wife did not come to the precinct that night to pass the time. She came to see and speak to her husband *566 which she was not permitted to do until after his statements had been taken. This denial falls squarely within the proscription of People v. Taylor (22 A D 2d 524 [1st Dept.]).
As in People v. Ressler (45 Misc 2d 995) although this defendant does not concede that he was not physically coerced, the record of this hearing is devoid of any endeavor upon the part of the defendant to prove that any coercion, physical or otherwise, was perpetrated upon him which caused him to involuntarily make and sign the statements against his interest. The hearing record contains no evidence that the defendant was struck, threatened, or promised anything to induce him to make any inculpatory statements. The defendant’s attack on the “ voluntariness ” of his statements is of a far more sophisticated kind. His principal thrusts are, in effect, that his statement (People’s Exh. I) is involuntary because it was taken from him in the absence of counsel — after his wife had requested and was denied permission to see him at the precinct while he was being interrogated (People v. Taylor, supra) —and, after counsel had telephoned the precinct while he was being questioned and demanded that no statement be taken (People v. Gunner, supra).
Until recent times the law of this State regarding noncoerced statements taken from suspects prior to arraignment or indictment was unsettled (People v. Stanley, 15 N Y 2d 30, 32). Had the suspect requested counsel? Had the police failed to warn him of his constitutional right to remain silent? Had the investigation become “ accusatory ” rather than “ investigatory ” in nature? Had some member of the accused’s family retained counsel or sought themselves to contact the accused during his interrogation? Was access denied to retained counsel? Had retained counsel instructed the police not to question his client in his absence? Did the findings of the Supreme Court in Escobedo compel an extension of the established law of this State as defined in People v. Donovan (13 N Y 2d 148) ?
These questions and others, although not totally encompassing those necessary to resolve this hearing, were at long last answered by the Court of Appeals in People v. Gunner (supra). In that case the court answered negatively the question raised in People v. Stanley and held that inculpatory statements taken from a suspect while in custody prior to arraignment or indictment and while the suspect is the sole target of the investigative process are admissible even though the police have not advised him of his privilege to remain silent or of his right to counsel. Therefore, the law of this State as defined in the Donovan case *567 insofar as that law relates to nonrepresented suspects remains unchanged.
However, People v. Gunner (supra) clarifies the law of the Donovan case so as to require the exclusion of inculpatory statements made by a defendant before arraignment or indictment but after the police have been advised that the defendant is represented by counsel who has requested that no statements be taken from his client. That is precisely what happened here! Pursuant to Gunner it is not necessary to exclusion that access to the attorney be denied — it is enough that the police know that the defendant is represented and that the retained attorney does not want any statements taken in his absence. Detectives Burlison and Q-older admitted their knowledge of the attorney’s telephone call as well as of his instructions and they based their taking of the statement (People’s Exh. I) upon the premise that it was accomplished before the attorney called.
However, upon the ground of my reasonable doubt as to the time when the defendant’s counsel telephoned the precinct, I must determine this issue in behalf of the defendant.
People v. Huntley (15 N Y 2d 72, 78, supra) holds that “The burden of proof as to voluntariness is on the People ’ ’ and that “ The Judge must find voluntariness beyond a reasonable doubt before the confession can be submitted to the trial jury
With regard to the presence of the defendant’s wife at the precinct upon the night in question which the People’s witnesses admitted, People v. Taylor (supra, p. 525) says: “ Although defendant’s family were at the police station during much of the time defendant was being interrogated, they were not permitted to consult with him. There is no testimony that they expressly asked to talk with defendant that evening, but it is reasonable to assume that that was why they went there, and that they were denied the privilege ’ ’.
People v. Hocking (15 N Y 2d 973) supplements the holding in People v. Taylor when it says: “ The fact that the police refused a request by the defendant’s father to see and speak with the defendant during the period he was being questioned by the police at the station house, while not in and of itself sufficient reason or basis for excluding the defendant’s confession, may, of course, upon the hearing which we are directing, be considered, along with all the other circumstances of the interrogation, in passing upon the voluntariness of the defendant’s statements ”.
It has been the history of the development and growth of our system of law that our courts most regularly bow to the les *568 sons of experience and better judgment. However, until both elements combine to produce the unlikely, namely, a judgment totally acceptable to all points of view in this somewhat volatile field, permit me to venture the thought, to those who incline to the view that the path of justice is oft impeded by the somewhat libertarian views contained in several of the decisions referred to herein, that, as Mr. Justice Frankfurter was moved to say in his foreword to the Holmes-Laski letters, ‘ ‘ The world suffers less from knight errantry induced by a passion for liberty than from prudence dictated by self-regard.” To those who understandably demur from that thought, I respectfully suggest that patience in the pursuit of justice is no vice.
People’s Exhibit II in evidence having admittedly been taken after the telephone call from the defendant’s attorney must be suppressed without extraneous discussion (People v. Gunner, supra).
In view of the foregoing I find that each of the defendant’s statements People’s Exhibits I and II was not voluntarily given.